RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

TIMOTHY A. CARL,

                    *Plaintiff-Appellant,*

    *v.*

MUSKEGON COUNTY, et al.,

                    *Defendants,*

KATHERINE JAWOR,

                    *Defendant-Appellee.*

No. 13-2296

—————————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cv-00094—Robert J. Jonker, District Judge.

Decided and Filed:  August 15, 2014

Before: COLE, Chief Judge; ROGERS and ALARCÓN, Circuit Judges.[*]

—————————————

## COUNSEL

**ON BRIEF:**  Bradford W. Springer, SCHOLTEN FANT, P.C., Grand Haven, Michigan, for
Appellant.  Douglas P. Vanden Berge, RHOADES MCKEE, P.C., Grand Rapids, Michigan, for
Appellee.

---

[*]The Honorable Arthur L. Alarcón, Senior Circuit Judge for the United States Court of Appeals for the
Ninth Circuit, sitting by designation.

_____

**OPINION**

_____

COLE, Chief Judge.   Medical professionals at the Muskegon County Jail evaluated Timothy Carl, a pretrial detainee with a history of mental illness, after he exhibited several odd behaviors.  Concerned that Carl might endanger himself or others, Dr. Katherine Jawor examined Carl but determined that he did not meet the criteria for involuntary hospitalization.  In making this determination, Dr. Jawor acted under color of state law because she performed a public function by evaluating an individual in the state's custody.  The district court erred in reaching a different conclusion.  We therefore reverse the district court's grant of summary judgment to Dr. Jawor and remand for further proceedings.

## I.  BACKGROUND

Timothy Carl was arrested under bizarre circumstances.  While working as an in-home healthcare provider for an elderly couple, Carl experienced a psychotic break, urinating on one client's head and attempting to dispense liquid soap on another's.  Muskegon County prosecutors charged Carl with vulnerable-adult abuse, and he was held as a pretrial detainee at the county jail.

The strange nature of Carl's arrest, coupled with his behavior during the inmate-booking process, prompted an evaluation as to whether he presented a danger to himself or others and whether he should be involuntarily hospitalized.  Mental health services at the jail were contracted out to an agency established by Muskegon County.  That agency, Community Mental Health Services ("CMH"), agreed to "provide mental health [and psychiatric] services to the inmates of the Muskegon County Jail" in its operating agreement.

On March 3, 2008, two CMH employees, Jule McLaughlin and Steve Weinert, examined Carl at the jail.  McLaughlin, a physician's assistant, indicated that Carl was "floridly psychotic," that he had considered killing himself, and that he required treatment in a psychiatric facility.  McLaughlin had previously prescribed Carl an anti-psychotic medication but noted that his current medications were "not very effective."

Weinert's assessment of Carl echoed McLaughlin's conclusions. Weinert, a limited-licensed psychologist at CMH, documented that Carl was "paranoid" because he described a "glowing light in his cell that [was] tugging at his brain." In Weinert's judgment, Carl "require[d] intensive psychiatric treatment" and hospitalization. Unable to certify Carl for involuntary hospitalization himself, Weinert enlisted Dr. Katherine Jawor's assistance to determine whether hospitalization was appropriate.

Dr. Jawor is the focal point of this case. She served as an independent contractor for CMH and examined Carl on March 5. Before interviewing Carl, Dr. Jawor knew that McLaughlin had prescribed an anti-psychotic and that Weinert had documented Carl's paranoid behaviors. But during Dr. Jawor's evaluation, Carl denied feeling depressed, denied suicidal and homicidal ideations, and denied experiencing paranoid delusions and auditory hallucinations. This marked a dramatic change from the delusional state Weinert and McLaughlin reported merely two days before. Dr. Jawor asked Carl about this transformation, and Carl stated that he was just "messing with" Weinert and McLaughlin when they interviewed him. By the end of Dr. Jawor's evaluation, Carl agreed to take his medications, which he had previously refused. In Dr. Jawor's opinion, based on Carl's "pleasant and cooperative" demeanor, he did not meet the criteria for involuntary hospitalization. This was the first and only time Dr. Jawor examined Carl.

Carl argues that, due in part to Dr. Jawor's negative certification, he did not receive the mental health services he needed and that his "uncontrolled psychotic state" worsened, causing serious harm to his mental and physical health while detained at the jail. He filed a complaint under 42 U.S.C. § 1983 in federal district court against Dr. Jawor, Muskegon County, and others, alleging that the defendants disregarded an obvious and excessive risk to his health in violation of his Eighth and Fourteenth Amendment rights. All defendants except Dr. Jawor were dismissed after signing a settlement agreement.

The district court held that Dr. Jawor was not a state actor because Carl had not demonstrated that performing an involuntary commitment determination is a public function. In granting summary judgment to Dr. Jawor, the court did not address whether she deprived Carl of a right secured by the Federal Constitution or federal law.

Carl timely filed this appeal.

## II. ANALYSIS

We review the grant of summary judgment de novo and draw all inferences in favor of the non-moving party. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A plaintiff suing under § 1983 must establish that he was denied a constitutional right, and that the deprivation was caused by a defendant acting under color of state law. *Jones v. Duncan*, 840 F.2d 359, 361–62 (6th Cir. 1998). The Eighth Amendment protects prisoners from cruel and unusual punishment, and pretrial detainees are similarly protected under the Due Process Clause of the Fourteenth Amendment. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008).

The only issue before the court is whether Dr. Jawor, a private psychiatrist, acted under color of state law. Private individuals may be considered state actors if they exercise power "possessed by virtue of state law" and if they are "clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941). The question turns on whether the private individual's actions can be fairly attributed to the state. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). Our court has identified three tests to resolve the state-actor inquiry: the public-function test, the state-compulsion test, and the nexus test. *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995). The parties agree that this case implicates the public-function test, which "requires that the private [individual] exercise powers which are traditionally exclusively reserved to the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). The Sixth Circuit has interpreted this test narrowly; rarely have we attributed private conduct to the state. *Chapman v. Higbee Co.*, 319 F.3d 825, 833–34 (6th Cir. 2003). Nevertheless, Carl argues that Dr. Jawor is a state actor under the public-function test and that *West v. Atkins*, 487 U.S. 42 (1988), supports his position. We agree.

We start from the basic premise that states must provide medical care to those in custody. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("[E]lementary principles establish the government's

obligation to provide medical care for those whom it is punishing by incarceration."). *West v. Atkins* outlines the contours of this principle in the context of using private contractors to provide prison healthcare. In *West*, North Carolina contracted with a private physician to provide orthopedic services to inmates at a state prison. 487 U.S. at 43–44. After an inmate tore his Achilles tendon, the doctor refused to operate and opted for a non-surgical treatment plan. *Id*. at 44. The inmate then sued under § 1983, claiming that the doctor's decision to forgo surgery constituted deliberate indifference to his medical needs. *Id*. at 45.

The Supreme Court held that the doctor was a state actor because "[t]he State bore an affirmative obligation to provide adequate medical care to [the plaintiff]; the State delegated that function to [the doctor]; and the [doctor] voluntarily assumed that obligation by contract." *Id*. at 56. Although the physician in *West* had a contractual obligation to treat inmates, the Court made two points clear: first, an employment relationship with the state is not dispositive of the state-actor inquiry. *Id*. Second, the amount of time a physician expends exercising his duties does not resolve the state-actor question either. *Id*. Rather, "[i]t is the physician's function . . . that determines whether he is acting under color of state law." *Id*. Courts discern this function by focusing on "the relationship among the State, the physician and the prisoner." *Id.*

A state may not escape § 1983 liability by contracting out or delegating its obligation to provide medical care to inmates. *Id*. at 56 n.14; *cf. Estelle*, 429 U.S. at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."). Indeed, our court has held that "private physicians serving inmate populations satisfy the state-action requirement of [§ 1983]." *Johnson v. Karnes*, 398 F.3d 868, 876 (6th Cir. 2005); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) ("It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmanes may be sued under § 1983 as one acting 'under color of state law.'"); *see also Conner v. Donnelly*, 42 F.3d 220, 225–26 (4th Cir. 1994) (holding that a private doctor who treated an inmate was a state actor although he had no contract with the prison). Applying these standards to the present case, we can fairly attribute Dr. Jawor's conduct to the state.

Dr. Jawor engaged in a public function by evaluating Carl, an individual involuntarily in custody. Attributing Dr. Jawor's conduct to the state is appropriate because Dr. Jawor performed a function that the state would typically carry out. *West*, 487 U.S. at 47 ("[I]n the prison context, medical care is within 'the exclusive prerogative of the State,' in that the State is obligated to provide medical service for its inmates and has complete control over the circumstances and sources of a prisoner's medical treatment."). It makes no difference that Carl was assessed for psychiatric treatment as opposed to medical care more generally. *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The right to both kinds of care is protected under the Eighth Amendment.

True enough, Dr. Jawor did not have a direct employment relationship with Muskegon County Jail to provide psychiatric services to detainees. She was, however, under contract with the county, through its agency CMH, to administer services to pretrial detainees held at the Jail. (Contract, R. 238-5, PageID 3337; Operating Agreement, R. 247-4, PageID 3612.) Whether Dr. Jawor was employed directly by the state does not control whether she was a state actor—*West* eliminates any ambiguity on this point. *West*, 487 U.S. at 55–56 ("It is the physician's function within the state system, not the precise terms of [her] employment, that determines whether [her] actions can fairly be attributed to the State.").

The two cases the district court relied on, *Ellison v. Garbario*, 48 F.3d 192 (6th Cir. 1995) and *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992), do not govern this case. In *Ellison*, a private doctor committed a patient under a Tennessee involuntary commitment statute. 48 F.3d at 195. To determine whether the physician's conduct satisfied the public-function test, the plaintiff had to establish that involuntary commitment is a traditional state function. *Id*. at 196. Because the plaintiff failed to offer evidence about the "history of involuntary commitment in Tennessee," the court held that the defendant was not a state actor. *Id*. There was no state action in *Ellison* because the doctor was not "contractually bound to the state." *Id*. at 197. But *West* addressed this precise point in stating that an employment relationship does not control whether a private individual acts under color of state law. *West*, 487 U.S. at 56. More importantly, the plaintiff in *Ellison* was not a ward of the state. *Ellison*, 48 F.3d at 194. This distinction is key.

Because *Ellison* did not arise in the context of providing mental health care to those in the state's custody, the district court should not have relied on that case.

*Wolotsky* is similarly distinguishable. The plaintiff in that case worked for a private company that provided mental health services for the county. 960 F.2d at 1333. After the plaintiff was discharged from his employment without a hearing, he sued his employer under § 1983. *Id*. at 1334. The employer's action did not constitute state action because "providing mental health services has not been a power which has traditionally been exclusively reserved to the state." *Id.* at 1335. The district court, attracted by this seemingly applicable language, concluded that Dr. Jawor was not a state actor. But context matters. Because *Wolotsky* did not arise in a custodial setting, it does not apply where, as here, the state has absolute dominion over a detainee's care. Providing medical care to prison inmates and pretrial detainees is indeed a power that has traditionally been reserved to the state.

We are sensitive to Dr. Jawor's argument that her involvement in Carl's care was minimal. She lacked a pre-existing relationship with Carl, did not review his medical history before her interview, and provided deposition testimony that neither her supervisor nor anyone else asked her to do anything beyond determining if involuntary hospitalization was warranted. With no intention to treat Carl over an extended period of time, Dr. Jawor did not schedule a follow-up appointment to see if Carl was taking his medication, whether the dosage was too high or low, or if there were adverse side effects associated with his medication. She recognized that a jail physician was on duty at all times and assumed that someone else would assume these responsibilities. We do not address whether Dr. Jawor's role was limited to a one-time evaluation for involuntary commitment. Regardless, these facts speak more directly to whether Dr. Jawor disregarded a risk to Carl's claimed medical needs (i.e., to the merits of his Eighth and Fourteenth Amendment claims); they are of modest value in assessing her status as a state actor.

As it stands, the district court's holding—finding no state action—would incentivize the state to contract out, piece by piece, features of its prison healthcare system. In turn, each private actor providing medical care could disclaim liability under § 1983, downplaying their role in the prison system as so nominal that they should not be considered state actors. Sanctioning a state's delegation of duties in this manner is incompatible with *West*, which admonishes that

"[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West*, 487 U.S. at 56. In the face of today's expansion of healthcare outsourcing and prison privatization, these activities, many of which are necessary and well-intentioned, do not absolve a state from adhering to constitutional precepts.

### III. CONCLUSION

We reverse the district court's grant of summary judgment and remand the case for proceedings consistent with this opinion.