RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0319p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ADRIENNE L. HOWELL,

　　　　　*Plaintiff-Appellant*,

　　*v.*

FATHER MALONEY'S BOYS' HAVEN, INC., dba Father
Maloney's Boys and Girls Haven; JEFF HADLEY,
Individually and in his official capacity as Chief
Executive Officer of Father Maloney's Boys' Haven,
Inc.,

　　　　　*Defendants-Appellees*.

┐
│
│
│
│
│  No. 20-5122
│
│
│
│
│
│
┘

─────────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:18-cv-00192—Gregory N. Stivers, District Judge.

Decided and Filed:  October 1, 2020

Before:  SILER, SUTTON, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Christina R. L. Norris, RENDIGS, FRY, KIELY & DENNIS, LLP, Louisville,
Kentucky, B. Keith Saksefski, WEBER ROSE, Louisville, Kentucky, for Appellant.  Joseph C.
Klausing, O'BRYAN, BROWN & TONER, PLLC, Louisville, Kentucky, for Appellees.

─────────────────

## OPINION

─────────────────

　　SUTTON, Circuit Judge.  Does Father Maloney's Boys and Girls Haven count as a state
actor under 42 U.S.C. § 1983?  The district court ruled that the Boys and Girls Haven, a

residential institution that provides treatment to at-risk youth, does not fit the bill. We agree and affirm.

## I.

An agency of the Commonwealth of Kentucky, the Cabinet for Health and Family Services regulates the placement of at-risk children in the Commonwealth's custody. In caring for such children, the agency often contracts with private facilities.

Father Maloney's Boys and Girls Haven is a private, non-profit entity. It educates, treats, and provides day-to-day care to abused and neglected children that it houses on a residential campus. The Commonwealth has hired the Haven to provide care for neglected children.

The Haven hired Adrienne Howell to work with "horses and youth" as an "equine specialist." R.31 at 4. In March 2017, Robert Brown Lester, a resident of the Haven, arrived early for his training. Howell had worked one-on-one with Lester for about three months. But his early afternoon arrival came as a surprise. Hoping to make the most of the added manpower, Howell asked Lester to perform chores around the Haven's horse barn.

Lester apparently had other reasons for showing up early. He grabbed her, choked her unconscious, dragged her into the bathroom, and sexually assaulted her. She awoke bound, beaten, and bruised. Since the assault, Howell has struggled with pain and anxiety and has not been able to return to work.

Howell sued the Haven, its leadership, and the agency's leaders in state court, alleging several state-law claims as well as a violation of her Fourteenth Amendment liberty interest to be free from unjustified personal intrusions. Defendants removed the case to federal court. The district court dismissed the agency and its employees from the case. That left the state-law claims and the § 1983 claim against the Haven. Reasoning that the Haven was not a state actor, the court dismissed the federal claim and remanded the state-law claims to state court.

## II.

Section 1983 provides a remedy against any person acting under color of state law for "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the

United States.  42 U.S.C. § 1983.  Only claims against "state actors" are eligible for relief under the statute.  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 940 (1982).

To determine whether a private entity qualifies as a state actor, we ask whether its "conduct is 'fairly attributable to the State.'"  *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quotation omitted).  That's somewhat helpful.  More helpful is whether the State's Constitution treats the entity or person as an organ of state government or as a state official.  But even if that is not true, as it is not for the Haven, case law has used other inquiries to determine whether an entity should be treated as a state actor under § 1983.  Such as:  Did the State compel the Haven to act the way it did?  *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).  Was there a symbiotic relationship between the Haven and the State?  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 842–43 (1982).  Did the Haven serve a public function traditionally handled just by the State?  *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974).

Howell claims that the Haven counts as a state actor because it undertakes a public function—that it exercises "powers traditionally exclusively reserved to the State."  *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (quotation omitted).  That's not a minor hurdle.  It does not suffice that the state agency "exercised the function in the past" or that the "function serves . . . the public interest in some way" or that the entity charges the State for the service.  *Id.* at 1928–29; *Rendell-Baker*, 457 U.S. at 842.  To qualify, the "government must have traditionally *and* exclusively performed the function."  *Halleck*, 139 S. Ct. at 1929.

The Haven provides housing, education, "treatment[,] and crisis stabilization of at-risk youth."  R.31 at 2.  The Commonwealth has not exclusively provided that function.  From Kentucky's founding to the present, private actors have been instrumental in providing such care.

Begin with Kentucky's first poor law, enacted the year after the Commonwealth became a State.  *See An Act Concerning the Poor*, 1793 Ky. Acts 45.  The Act empowered county courts to place destitute children into the "homes of those who could afford an extra mouth to feed."  Honor Sachs, *Home Rule: Households, Manhood, and National Expansion on the Eighteenth-Century Kentucky Frontier* 83 (2015).

Move to the turn of the next century. In 1904, the Kentucky Supreme Court asked: "May not the Legislature avail itself of the offer and services of such persons in doing what it unquestionably has the right to do by state officers—to care for the helpless and destitute children of the state?" *Hager v. Ky. Children's Home Soc'y*, 83 S.W. 605, 609 (Ky. 1904); *see also Speer v. Ky. Children's Home*, 128 S.W.2d 558, 558 (Ky. 1939). It's not just that the Commonwealth historically relied upon families and private associations to care for Kentucky's young. The salient point is that the State has *predominantly* placed that duty in the hands of "church-supported institutions for which standards of care were limited to those self-imposed by patrons and directors." Constantine William Curris, *State Public Welfare Developments in Kentucky*, 64 Reg. Ky. His. Soc'y 299, 324 (1966); *see also* James W. Ely, Jr., *"There Are Few Subjects in Political Economy of Greater Difficulty": The Poor Laws of the Antebellum South*, 10 Am. B. Found. Rsch. J. 849, 865 (1985).

What of the present? Just this year, a Kentucky Senate Resolution commemorated the 150th anniversary of Sunrise Children's Services, one of the many private childcare agencies operating in the Commonwealth. *See A Resolution Recognizing the 150th Anniversary of Sunrise Children's Services*, 2020 Regular Session Senate Resolution 83. Sunrise, a private Christian organization that "has been at the forefront in the fight to protect Kentucky's children since June 30, 1869" and that continues to shoulder that flag today, is one of the Commonwealth's "oldest and largest childcare agencies, providing a full continuum of services for abused and neglected children." *Id.*; *see also Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 868 (6th Cir. 2015).

Across the country, there's near uniformity that foster homes do not count as state actors. *See Malachowski v. City of Keene*, 787 F.2d 704, 710–11 (1st Cir. 1986) (per curiam); *Leshko v. Servis*, 423 F.3d 337, 343–46 (3d Cir. 2005); *Milburn by Milburn v. Anne Arundel Cty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989); *United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005); *Ismail v. County of Orange*, 693 F. App'x 507, 512 (9th Cir. 2017); *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 & n.10 (11th Cir. 2001). *But see Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974). Like most foster homes, the Haven houses, educates, and provides day-to-day care to the children under its roof. And like most foster homes, the Haven

has no power to remove children and place them under appropriate care or in juvenile correctional facilities—the kinds of things state actors traditionally may do. All in all, Kentucky has not "traditionally *and* exclusively" performed these functions, *Halleck*, 139 S. Ct. at 1929, and the Haven is not standing in its shoes when offering these eleemosynary services.

Permitting § 1983 claims against entities like the Haven might also do more harm than good. It could cause some benevolent entities, otherwise inclined to offer a charitable service for the State, to "abandon their plans." *See Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 182 (4th Cir. 2010) (Wilkinson, J., concurring); *see also Filarsky*, 566 U.S. at 391. And it could cause complications for private entities that provide secular services in the name of faith-based missions—not as easy a thing to do if the entity becomes a state actor for federal constitutional purposes. *See Teen Ranch, Inc. v. Udow*, 479 F.3d 403, 406 (6th Cir. 2007).

Howell claims that *West v. Atkins*, 487 U.S. 42 (1988), advances her cause. That's not the case. *West* held that a physician under contract to provide medical services to state inmates in a state prison qualified as a state actor under § 1983. *Id.* at 54. In *West*, the "state itself was directly responsible for managing" the facility in which the alleged constitutional violation occurred. *Holly v. Scott*, 434 F.3d 287, 294 (4th Cir. 2006); *see also Leshko*, 423 F.3d at 340. The Haven in contrast is "privately run." *Holly*, 434 F.3d at 293–94. *West* also involved a "correctional setting," a prototypical state function "designed" to remove individuals "from the community." 487 U.S. at 56 n.15. Far from incarcerating children placed under its care, the Haven facilitates their continuing engagement and presence in the community. This is not a remotely comparable exertion of state power. *See Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 29 (1st Cir. 2002); *Leshko*, 423 F.3d at 346; *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1456 n.3 (10th Cir. 1995).

*Brent v. Wayne County Department of Human Services*, 901 F.3d 656 (6th Cir. 2018), doesn't move the needle either. There, applying the "less stringent standards" we often afford to pro se litigants, this court held that the plaintiffs had "alleged enough facts to plausibly state" that two private children's homes could be state actors. *Id.* at 676 (quotation omitted). But that was because "a number of [the] plaintiffs' allegations concern[ed] conduct the child-care organizations and [state] employees undertook together." *Id.* at 677. For example, the foster

homes "worked together" with the state to "supervis[e the] foster placements," "mak[e] recommendations to the court regarding the children's care and custody," "oversee[] family visits," and "develop[] service plans" for the children the State had removed from private homes. *Id.* (quotation omitted). Howell's allegations do not show that "a 'close nexus' exists 'between the State and the challenged action.'" *Id.* at 676 (quotation omitted).

Also unpersuasive is the theory that the Haven is a state actor due to its "willful" involvement "in joint activity with the State." *United States v. Price*, 383 U.S. 787, 794 (1966). For that to matter, Kentucky must have "so far insinuated itself into a position of interdependence with" the Haven that "it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). That did not happen. A contract for services between the Haven and the Commonwealth, together with a state license to operate the home, does not a state actor create. *Halleck*, 139 S. Ct. at 1931; *Simescu v. Emmet Cty. Dep't of Soc. Servs.*, 942 F.2d 372, 375 (6th Cir. 1991). This is not one of the "few limited circumstances" in which "a private entity can qualify as a state actor." *Halleck*, 139 S. Ct. at 1928.

For like reasons, it does not make a difference that the Haven must comply with Kentucky regulations, including licensing requirements and a standard of care. *See* Ky. Rev. Stat. §§ 199.640, 199.650, 600–645. Requiring private actors to follow statutory mandates, even if they're "extensive," doesn't transform them into public servants. *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987); *Jackson*, 419 U.S. at 350. Else, it would be the rare entity that was not a public actor.

Even though Howell may not sue the Haven under § 1983, her state-law claims against the Haven, its leadership, and Lester endure. She is free to present them to the state courts, where she filed these claims in the first place.

We affirm.