RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RHIANNON NUGENT and JUAN QUINTANA, SR., Co-Personal Representatives of the Estate of Juan A. Quintana, II, deceased,

*Plaintiffs-Appellants*,

*v.*

SPECTRUM JUVENILE JUSTICE SERVICES; SPECTRUM HUMAN SERVICES, INC.,

*Defendants-Appellees*.

No. 22-1487

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-12741—George Caram Steeh III, District Judge.

Argued: March 8, 2023

Decided and Filed: June 28, 2023

Before: GRIFFIN, BUSH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Jonathan R. Marko, MARKO LAW, PLLC, Detroit, Michigan, for Appellant. Nathan Scherbarth, ZAUSMER, P.C., Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Jonathan R. Marko, MARKO LAW, PLLC, Detroit, Michigan, for Appellant. Nathan Scherbarth, Mark J. Zausmer, Jonathan R. Reshour, ZAUSMER, P.C., Farmington Hills, Michigan, for Appellees.

BUSH, J., delivered the opinion of the court in which MURPHY, J., joined. GRIFFIN, J. (pp. 13–18), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

JOHN K. BUSH, Circuit Judge.  This case arises from the suicide of Juan Quintana, II, a fifteen-year-old, at a facility operated by defendants Spectrum Juvenile Justice Services and Spectrum Human Services, Inc. (collectively, Spectrum) in Highland Park, Michigan. Representatives of Quintana's estate sued Spectrum based on *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The complaint alleges that Spectrum functioned as a state actor and violated Quintana's Eighth and Fourteenth Amendment rights when its personnel failed to visually check on him as required by state contract.  The district court dismissed plaintiffs' suit on the ground that the complaint did not plausibly allege state action under 42 U.S.C. § 1983. We respectfully disagree, as explained below.  We therefore REVERSE and REMAND for further proceedings.

I.

We recite the relevant facts as alleged in the complaint.  Spectrum is licensed by the State of Michigan to run a "private child caring institution."  Spectrum contracts with the state to house children who are ordered to be detained in Spectrum's facilities.  The facilities are "similar to a prison setting"—the children are completely restricted in their movements, and the state requires Spectrum to monitor them on a 24/7 basis.

A court ordered Quintana's detention at Spectrum's Highland Park facility on August 24, 2018.  In the days that followed, he struggled with depression, anxiety, and difficulty sleeping, among other things.  On the evening of September 11, 2018, between 7:57 PM and 8:42 PM, Quintana took his own life in his bedroom at the facility.  He died alone.  No one checked his room in the forty-five minutes between the last time he was seen alive and when his body was found.

That fatal omission violated a contractual requirement the state imposed on Spectrum to surveil children through "eye-on checks" every fifteen minutes when they are "outside of the direct supervision of staff."  The failure of Spectrum to check on Quintana for forty-five minutes

was not an aberration from normal practice. In fact, Spectrum had a policy or custom of skipping many eye-on checks and falsifying supervision logs to reflect that the eye-on checks had been performed. These neglectful and deceptive activities were all the more troubling because Spectrum's residents often struggled with self-harm and suicide, "so much so that employees would walk around with scissors in their pockets in order to cut down inmates who were attempting to hang themselves." Compl., R.10, at ¶50.

In the immediate aftermath of Quintana's suicide, plaintiffs brought a state-law negligence claim related to the death against Spectrum in Michigan state court. A little over a year later, plaintiffs filed the present action in the district court. Plaintiffs allege a *Monell* claim against Spectrum based on Eighth or Fourteenth Amendment violations; they argue that Spectrum violated Quintana's constitutional rights by its policy or custom of deliberately foregoing eye-on checks. That policy or custom, in turn, amounted to deliberate indifference toward his patent risk of committing suicide.

Spectrum moved to dismiss on several grounds. At issue in this appeal is Spectrum's argument that plaintiffs failed plausibly to allege state action. Spectrum maintains that it was not engaged in a public function and therefore a claim under 42 U.S.C. § 1983 is untenable. The district court agreed and dismissed the complaint for failure to state a claim on which relief could be granted. The court analogized the Highland Park facility to the foster home at issue in *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750 (6th Cir. 2020), that we determined was not a state actor.

Plaintiffs timely appealed.

II.

This court reviews grants of motions to dismiss de novo. *See Bouye v. Bruce*, 61 F.4th 485, 489 (6th Cir. 2023). We accept all well-pleaded allegations in the plaintiff's complaint as true and view facts in the light most favorable to the plaintiff, though we "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581–82 (6th Cir. 2007)); *see Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 228 (6th Cir. 2005).

I.

A § 1983 claim under a *Monell* theory of liability requires the plaintiff to allege that the local government's official policy was "the moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (cleaned up) (quoting *Monell*, 436 U.S. at 694). Here, plaintiffs allege that Spectrum's custom or policy of skipping eye-on checks rose to the level of a constitutional violation in the form of deliberate indifference to Quintana's serious medical needs. But to maintain such a claim, plaintiffs also must sufficiently allege that Spectrum was a state actor. We conclude they have met this latter requirement.

Section 1983's text and history confirm that it covers the acts of private individuals in certain cases. Start with the text. Section 1983 expressly applies to "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plain reading of the text envisions liability for "every person" who violates the provision, not just public officials. *See id.* Supreme Court precedent confirms this reading, noting that "a private party . . ., even though not an official of the State, can be liable under § 1983." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents[.]" (quoting *United States v. Price*, 383 U.S. 787, 794 (1966))).

This interpretation of § 1983 is deeply rooted in its history. The provision comes from § 1 of the Enforcement Act of 1871, also known as the Ku Klux Klan Act. 17 Stat. 13. That statute, like other civil-rights legislation of its era, sought to regulate the actions of not only the state, but also private individuals who acted under the color of law. *See Adickes*, 398 U.S. at 162–66; *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 424–26 (1968) (describing how the Civil Rights Act of 1866, 14 Stat. 27—legislation that the Enforcement Act closely mirrors—was also intended to redress the deprivation of rights inflicted on Blacks by both private and government actors). Congress's first attempt to provide remedies for the deprivation of civil rights of U.S.

citizens took the form of § 2 of the Civil Rights Act of 1866. 14 Stat. 27–30. But there was fear that Congress lacked constitutional power to pass such legislation, which pre-dated the Fourteenth Amendment. *See* Kurt T. Lash, 2 THE RECONSTRUCTION AMENDMENTS 12 (Kurt T. Lash, ed., 2021). So, after the Fourteenth Amendment was ratified, Congress passed the 1870 Enforcement Act and later § 1 of the Enforcement Act of 1871, a provision to the same effect as § 2 of the Civil Rights Act of 1866. *See id.* at 601; *Adickes*, 398 U.S. at 162–63. Following enactment of the 1871 Enforcement Act, the *Civil Rights Cases* clarified that, under the Fourteenth Amendment, Congress could only remedy federal rights deprivations that could properly be attributed to a state. 109 U.S. 3, 10–11, 16–18 (1883). But the Court has since construed "under color of law" to carry a meaning that encompasses more than just state officials acting pursuant to state law. *See Monroe v. Pape*, 365 U.S. 167, 183–85 (1961). Recodified under 42 U.S.C. § 1983, § 1 of the Enforcement Act of 1871 carries a history of enforcement that has reached not only the main evil at the beginning of the post-bellum United States, the Ku Klux Klan, but also other private actors who violate federal rights while acting "under color of law"—that is, those who act, in some capacity, as agents of a state. *See Monroe*, 365 U.S. at 176 (enforcement meant to target "those who represent[] a State in some capacity."); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982) ("If the challenged conduct . . . constitutes state action as delimited by our prior decisions, then that conduct was also action under color of state law and will support a suit under § 1983.").

Our circuit precedent, accordingly, recognizes that private actors may be subject to § 1983 claims if their conduct qualifies them to be considered state actors. *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014). Essentially, "a private party's actions constitute state action under section 1983 where those actions may be 'fairly attributable to the state.'" *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (en banc) (quoting *Lugar*, 457 U.S. at 947). There are three tests for determining whether a private actor may be treated as a state actor: "the public-function test, the state-compulsion test, and the nexus test." *Carl*, 763 F.3d at 595 (citing *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995)). On appeal, plaintiffs argue that they pleaded sufficient facts to establish Spectrum as a state actor based on all three tests. Because we find that plaintiffs adequately allege state action under the public-function test, we address that test alone.

It "requires that the private [individual] exercise powers which are traditionally exclusively reserved to the state." *Carl*, 763 F.3d at 595 (alteration in original) (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).  This authority includes such functions as holding elections, exercising eminent domain, and operating a company-owned town.  *Chapman*, 319 F.3d at 833–34.  But we interpret the public-function test narrowly, and under it we rarely attribute private conduct to the state.  *See id.*  In *Wolotsky*, for instance, a plaintiff brought a § 1983 claim based on wrongful termination against a mental health institution under the theory that it was a state actor.  *Wolotsky*, 960 F.3d at 1333.  The court held that the plaintiff insufficiently alleged state action where all that was alleged was that the institution derived significant funding from the state and was subject to state regulations.  *Id.* at 1336.

But sometimes we do attribute state action to a private institution.  In *Carl*, the court considered a state-action issue in the mental health context.  We distinguished *Wolotsky* and found state action on the premise that in *Carl*, unlike in *Wolotsky*, the cause of action arose from treatment of a pretrial detainee in a custodial setting where the state "has absolute dominion over a detainee's care."  *Carl*, 763 F.3d at 597.  In such a setting the state cannot simply abrogate "§ 1983 liability by contracting out or delegating its obligations" to a private actor.  *Id.* (citing *West v. Atkins*, 487 U.S. 42, 56 n.14 (1988)).

To determine whether the public function test is satisfied, "the court conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing."  *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).  Plaintiffs can meet that burden by "advanc[ing] historical and factual allegations in their complaint giving rise [to] a reasonable inference that [the function] is traditionally exclusively in the province of the State."  *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014) (citing *Wittstock*, 330 F.3d at 902) (plaintiffs failed to adequately allege that disaster relief was a traditionally exclusive function of the state); *see also Ellison*, 48 F.3d at 196 (declining to consider a function public where the "plaintiff . . . neglected to offer any analysis concerning the history of involuntary commitment in Tennessee").  But we have not specified how much historical detail, if any, must be alleged where, as here, there is

sufficient case precedent to guide the state-action inquiry based on the present-day description of the facility as alleged in the complaint.[1]

Under our precedent, detention centers are generally considered "a public function traditionally reserved to the state." *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991) (per curiam) (finding state action where a private corporation maintained a pretrial detention facility). *Skelton* reasoned that a private company operating a correctional facility exercises a power that is "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 102 (quoting *West*, 487 U.S. at 49) (cleaned up). In *Street*, the panel determined that the defendants acted under the color of state law when they performed the "'traditional state function' of operating a prison." *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (citation omitted).[2]  Other circuits have generally held that correctional facilities perform a traditionally exclusive public function.  For example, the Fifth Circuit cited *Skelton* favorably for the proposition that state prisoners can bring § 1983 claims against privately owned correctional facilities.  *See Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 460–61 (5th Cir. 2003) (per curiam); *see also Doe v. N. Homes, Inc.*, 11 F.4th 633, 637–38 (8th Cir. 2021) (holding that a juvenile facility that could detain a juvenile exercises the power to incarcerate, a power exclusively held by the state); *Smith v. Cochran*, 339 F.3d 1205, 1215–16 (10th Cir. 2003)  ("[P]ersons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable for violations of the Eighth Amendment."); *Rodriguez-Garcia v. Davila*, 904 F.2d 90, 98 (1st Cir. 1990) ("[T]he provision of education, police protection, and prisons are public functions that, when

---

[1]We do not read *Marie* to require a plaintiff to allege the historical basis for every *new* state action claim—only for new functions.  In *Marie*, the proposed state function was administering disaster relief.  *Marie v. Am. Red Cross*, 771 F.3d 344, 362–63 (6th Cir. 2014).  Here, as will be discussed, our precedent has well established that incarceration is a traditional public function.  *See Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 102 (6th Cir. 1991).

[2]Our dissenting colleague relies on *Ellison v. Garbarino*, 48 F.3d 192, 196 (6th Cir. 1995), for the proposition that the inquiry into traditionally exclusive public functions must be state-specific.  As such, our colleague argues that the holdings in *Skelton* and *Street* are specific to Tennessee.  But *Ellison* opines on the state-specific nature of the inquiry in dicta only, and in fact relies in part on historical inquiries of other states to reach its conclusion that involuntary commitment is not a traditionally exclusive public function in Tennessee.  *See Ellison*, 48 F.3d at 196 n.2.  Likewise, neither *Skelton* nor *Street* cabins its holding concerning incarceration as a traditionally exclusive public function to the State of Tennessee alone.  *See Street*, 102 F.3d at 814; *Skelton*, 963 F.2d at 102.

'privatized,' still retain their public nature, and action under color of law may still be found."); *cf. George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996) (defendant conceded that incarceration is a traditionally exclusive state function).[3]

The mere fact that a facility has a remedial component, however, is not enough to demonstrate it exercises a traditionally exclusive public function—after all, some purely private entities may exercise that power. For instance, the Supreme Court determined that a school that provided education to maladjusted high school students was not a state actor. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982). Our own precedent holds the same. In *Howell*, a private entity in Kentucky, Boys' Haven, provided "housing, education, 'treatment[,] and crisis stabilization of at-risk youth.'" *Howell*, 976 F.3d at 753. We noted that "[f]rom Kentucky's founding to the present, private actors have been instrumental in providing such care." *Id.* The court referenced, for example, Kentucky's poor laws, which "empowered county courts to place destitute children into the 'homes of those who could afford an extra mouth to feed.'" *Id.* Further, we noted that there was a near uniformity that "foster homes do not count as state actors." *Id.* (citations omitted).

As *Howell* recognizes, private actors may execute functions that are similar to—but not quite—a traditionally exclusive public function. But the key for distinguishing state action is, in part, to determine whether a private actor is "'endowed with [state] powers beyond those enjoyed' by everyone else." *United States v. Miller*, 982 F.3d 412, 423 (6th Cir. 2020) (quoting *United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016)) (distinguishing between a state's ability to investigate a crime in order to bring a prosecution, a well-recognized police power, and a private actor's ability to investigate crime to protect private property). In the case of incarceration, when the state grants a private actor legal authority to exercise control over inmates, there is state action. *See West*, 487 U.S. at 56. The Supreme Court in *West*, for example, held that medical care provided in a correctional facility constituted state action. *Id.* at

---

[3]The Fourth Circuit, however, has concluded that incarceration cannot satisfy the public function test because it was never traditionally an exclusive state function. *See Holly v. Scott*, 434 F.3d 287, 293 (4th Cir. 2006). The *Holly* court relied on dicta in *Richardson v. McKnight*, in which Justice Breyer stated, "correctional functions have never been exclusively public." 521 U.S. 399, 405 (1997). But we interpret Justice Breyer's analysis to apply only to "questions of § 1983 immunity," not "whether [prison officials] are liable under § 1983 even though they are employed by a private firm." *Id.* at 413; *see Doe*, 11 F.4th at 638 (noting this distinction).

56. Medical care alone is not a traditionally exclusive public function. But the state had an obligation to medically treat its prisoners, and those prisoners were not free to seek their own care. *Id.* at 54–55. Thus, the medical care provider constituted a state actor because it acted under authority of the state to provide the constitutionally-mandated prisoner care. *Id.* at 55–57.

Following *West*, the Eighth Circuit determined that a plaintiff plausibly alleged that a private entity that ran a juvenile detention facility qualified as a state actor when it exercised authority to detain the plaintiff in a corrections unit. *Doe*, 11 F.4th at 637–38. *Howell* likewise recognizes the distinction between merely caring for troubled youth and incarcerating them. *See* 976 F.3d at 753. *Howell* distinguished its facts from *West* by noting that "*West* also involved a 'correctional setting,' a prototypical state function 'designed' to remove individuals 'from the community.'" *Id.* (citing *West*, 487 U.S. at 56 n.15). Boys' Haven, in contrast, was not a state actor because "like most foster homes, the Haven has no power to remove children and place them under appropriate care or in juvenile correctional facilities—the kinds of things state actors traditionally may do." *Id.*; *see Doe*, 11 F.4th at 637–38. Rather, it facilitated the youths' continuing engagement and presence in the community. *Howell*, 976 F.3d at 754.

The district court failed to recognize this distinction when it determined that Spectrum was not a state actor. The district court cited the Supreme Court's *Richardson* and *Rendell-Baker* decisions, as well as this court's *Howell* decision, for the proposition that the incarceration of juveniles "is not the exclusive province of the state." The district court further found it significant that plaintiffs did not allege that Spectrum had the power to decide to detain juveniles. But, as mentioned above, incarceration is a distinguishing factor for *Rendell-Baker* and *Howell*. *See Rendell-Baker*, 457 U.S. at 830; *Howell*, 976 F.3d at 753.

We hold that the complaint contains adequate facts to establish that Spectrum is a state actor. Plaintiffs allege Spectrum carries out the "public function of caring for youths at the direction of the State of Michigan." Compl., R.10, at ¶3. If the complaint's description had stopped there, then Spectrum's facility would be deemed closely analogous to the facility found to be a non-state actor in *Howell*. But here the allegations go further. Plaintiffs allege that the facility does not just care for children; the facility is "similar to a prison setting." They state that the "Defendants had influence and control over how long a child was detained at the facilities."

*Id.* at ¶26. According to the complaint, the children "are under 24 hours/7 days supervision, and their movements are restricted as though they were prisoners." *Id.* at ¶24. What's more, the children "are not free to leave the Defendant's facilities on their own volition, and their liberties are entirely restricted." *Id.* at ¶25. Plaintiffs allege that the state requires Spectrum to prevent the children from escaping and to contact local law enforcement if escape should occur. Finally, plaintiffs allege that Spectrum fulfilled "the public function of juvenile incarceration, detainment, commitment, [and] rehabilitation." *Id.* at ¶51.

These facts, taken as true and viewed in a light most favorable to the plaintiffs, suggest that the State of Michigan has endowed Spectrum with legal authority to exercise control over juveniles under court-ordered confinement. Plaintiffs allege that Quintana was court-ordered to the Spectrum facility. The facility was run like a prison, as detailed above. Quintana could obtain his release only through court order. Such a set of facts starkly contrasts with *Howell*, where the youth were not incarcerated, and the private entity served not to incarcerate but rather to facilitate youths' involvement in the community. *Cf. Howell*, 976 F.3d at 754.[4]

Given that our precedent has consistently held that the operation of correctional facilities is a traditionally exclusive state function, we hold that plaintiffs pleaded sufficient facts "giving rise [to] a reasonable inference that [the function] is traditionally exclusively in the province of the State." *Marie*, 771 F.3d at 362. The complaint therefore plausibly alleges state action.

IV.

Spectrum raised other arguments in the motion to dismiss that were not addressed below. We briefly comment on them here but remand for the district court to address them in the first instance.

First, Spectrum invoked qualified immunity, but that defense is "available only to individual government officials sued in their personal capacity." *United Pet Supply, Inc. v. City*

---

[4]The parties disagreed at oral argument whether all juvenile residents at the facility were there by court order. Spectrum's contract with the State of Michigan, attached to the complaint, suggests that some juvenile residents may not "have been adjudicated of a delinquency offense." This fact, if true, however, does not render implausible plaintiffs' allegations that the facility functioned as a state actor with respect to Quintana's own detention, which is alleged to be involuntary and based on violation of a probation order.

*of Chattanooga*, 768 F.3d 464, 484 (6th Cir. 2014). Just as the defense is "unavailable to the public entity itself," *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009), it is unavailable to "a private entity acting in a governmental capacity," *United Pet Supply, Inc.*, 768 F.3d at 484.

Second, Spectrum argues that plaintiffs failed to plead the deliberate indifference of Spectrum's personnel so as to justify the claim. The deliberate-indifference standard varies depending on whether a claim is brought under the Eighth or the Fourteenth Amendment. *Compare Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (applying Eighth Amendment standard), *with Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023) (applying Fourteenth Amendment standard). Plaintiffs allege violations under both the Eighth and Fourteenth Amendment, but it is unclear which of these provisions applies because the complaint does not state clearly whether Quintana was formally convicted of a crime (in which case the Eighth Amendment would seem to govern) or instead his custodial status was more akin to that of a pretrial detainee (to whom the Fourteenth Amendment would appear to apply). The complaint states only that Quintana was "court-ordered" to Spectrum's facility. We leave it to the district court first to determine whether the decedent's status at the Spectrum facility was more like that of a convicted prisoner or that of a pretrial detainee, and then to apply the proper standard based on that determination.

Finally, Spectrum seeks dismissal under the abstention doctrine of *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Under *Colorado River*, "considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (citing *Colorado River*, 424 U.S. at 817). Spectrum argues that, because there is a pending state court action between the same parties, the district court should abstain from exercising jurisdiction over this case. But there are several factors to be considered under a *Colorado River* abstention analysis, and we decline to review them in the first instance. *See Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 576 (6th Cir. 2013) (declining to rule on issues not decided below); *cf. Romine*, 160 F.3d at 339 ("[T]he district court must first determine that the concurrent state and federal actions are actually parallel." (citing *Crawley v. Hamilton Cnty. Comm'rs*, 744 F.2d 28 (6th Cir. 1984))).

V.

For the reasons stated above, we REVERSE the district court's dismissal of plaintiffs' *Monell* claim and REMAND for further proceedings consistent with this opinion.

---

**DISSENT**

---

GRIFFIN, Circuit Judge, dissenting.

The sole issue in this appeal is whether plaintiffs' complaint sufficiently alleged that defendants Spectrum Juvenile Justice Services and Spectrum Human Services, Inc. (Spectrum) are state actors for purposes of liability under 42 U.S.C. § 1983. Without engaging in the requisite historical analysis of Michigan's approach to caring for juveniles, the majority opinion finds defendants, who privately own and operate a juvenile detention center, to be state actors solely because of the correctional nature of their facility. I respectfully disagree and would affirm the district court.

I.

Defendants are private entities, and, as such, can only be subject to constitutional liability if their conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). We have recognized several tests when conducting this inquiry. *See, e.g.*, *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 752 (6th Cir. 2020). Today's appeal involves just one: the public-function test.[1] It provides that "a private entity may qualify as a state actor when it exercises powers traditionally exclusively reserved to the State." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (internal quotation marks omitted).

The public-function "test has been interpreted narrowly." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (en banc). Key is whether the government "traditionally *and* exclusively performed the function" at issue. *Halleck*, 139 S. Ct. at 1929. That emphasized conjunctive is crucial: "[i]t is not enough that the federal, state, or local government exercised

---

[1]Plaintiffs' brief asserts other ways to establish that a private entity is a state actor, but those arguments are abandoned and forfeited. In the district court, defendants moved for dismissal under Rule 12 contending that none of the applicable state-actor tests applied. In response, plaintiffs addressed only the public-function test. Their failure to substantively rebut defendants' positions on those other state-actor tests meant that they abandoned any argument on those tests below, *see, e.g.*, *Doe v. Bredesen*, 507 F.3d 998, 1007–08 (6th Cir. 2007), and forfeited any here, *Mynatt v. United States*, 45 F.4th 889, 897 (6th Cir. 2022).

the function in the past, or still does.  And it is not enough that the function serves the public good or the public interest in some way." *Id.* at 1928–29.  "[V]ery few functions," the Court has "stressed," so qualify.  *Id.* at 1929 (internal quotation marks omitted); *see also Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014) ("[R]arely have we attributed private conduct to the state.").

Our inquiry "require[s] some historical analysis to determine whether an action is one traditionally the exclusive prerogative of the state." *Ellison v. Garbarino*, 48 F.3d 192, 196 (6th Cir. 1995).  That historical showing is not one of general applicability; rather, it must be "state specific."  *Id.*  And because attaching constitutional liability to a private actor is the rare exception, we have emphasized that it is a plaintiff's burden to muster the historical facts in support.  *See Marie v. Am. Red Cross*, 771 F.3d 344, 362–63 (6th Cir. 2014); *Wittsock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902–03 (6th Cir. 2003); *Tahfs v. Proctor*, 316 F.3d 584, 593 (6th Cir. 2003); *Ellison*, 48 F.3d at 196.  Thus, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must "advance historical and factual allegations in [the] complaint giving rise [to] a reasonable inference that [the function at issue] is traditionally exclusively in the province of the State."  *Marie*, 771 F.3d at 362.

Plaintiffs' complaint falls woefully short of satisfying this burden.  Nowhere does it allege that defendants performed duties that the State of Michigan has exclusively *and* historically performed.  True, it describes the prison-like nature of the facility; defendants' contractual and regulatory obligations to Michigan; the details of Juan Quintana II's mental-health struggles; and the alleged abhorrent conduct by defendants' employees.  But it lacks any assertions regarding Michigan's historical approach to caring for juveniles.  Tellingly, neither the word "history," nor any of its derivatives, appear in plaintiffs' complaint.  Plaintiffs' briefing on appeal is similarly devoid of any Michigan-specific history.

As our court has stated many times before, "[c]onsidering that plaintiff bears the burden on this issue, this failure alone renders this test inapplicable." *Ellison*, 48 F.3d at 196; *accord Tahfs*, 316 F.3d at 593; *Marie*, 771 F.3d at 363; *Miller v. Gettel*, 2023 WL 2945340, at *4 (6th Cir. Apr. 14, 2023); *Cleary v. Cnty. of Macomb*, 409 F. App'x 890, 901 n.6 (6th Cir. 2011);

*Reguli v. Guffee*, 371 F. App'x 590, 600 (6th Cir. 2010); *Durante v. Fairlane Town Ctr.*, 201 F. App'x 339, 342 (6th Cir. 2006).  The same is true for the present case.

## II.

## A.

The majority opinion attempts to rescue plaintiffs' deficient pleading not with history, but with inapposite caselaw.  Two of our cases are relied upon, which each held that private corporations operating adult correctional facilities in *Tennessee* were state actors under the public-function test.  *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 812, 814 (6th Cir. 1996); *Skelton v. Pri-Cor, Inc.*, 963 F.2d 100, 101–02 (6th Cir. 1991) (per curiam).  The majority tries to extend that caselaw here, but there are several reasons why we should not do so.

First, while both Tennessee cases contain a categorical assertion that operating a prison is a "traditional state function [of Tennessee]," *Street*, 102 F.3d at 812; *accord Skelton*, 963 F.2d at 101, "no one fact can function as a necessary condition across the board for finding state action," *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). Precedent dictates our focus must not be on blanket claims of state action, but rather on the "state specific" historical nature of the function at issue. *Ellison*, 48 F.3d at 196.  Both *Street* and *Skelton* involved private prisons in Tennessee, not Michigan.  *Street*, 102 F.3d at 812; *Skelton*, 963 F.2d at 101.  Without an established, similar state history in Michigan, *Street* and *Skelton* cannot control.

Second, the state-actor analysis in *Street* and *Skelton* is fundamentally deficient.  Both cases relied on just one of the test's two components—that the adult prisons at issue there were "performing a public function traditionally reserved to the state." *Skelton*, 963 F.2d at 102; *accord Street*, 102 F.3d at 814.  Like the majority today, the cursory analysis in both opinions conducted no kind of *historical* examination as to whether Tennessee also "exclusively performed the function" of operating a prison. *Halleck*, 139 S. Ct. at 1929.

Third, the Supreme Court has cast significant doubt on the holdings of *Skelton* and *Street*. In *Richardson v. McKnight*, the Court signaled history is not on their side—in a dispute

involving a private adult prison in Tennessee, nonetheless. 521 U.S. 399, 404–05 (1997). The question there was whether employees of a private prison were entitled to qualified immunity from § 1983 claims. *Id.* at 401. History informed the Court's conclusion that immunity was unavailable due in part to the lack of a "firmly rooted tradition of immunity applicable to privately employed prison guards." *Id.* at 404 (internal quotation marks omitted).

To arrive at that conclusion, the Supreme Court chronicled the history of private prison systems generally, beginning in the Middle Ages in England and through the Nineteenth Century here in the United States. *Id.* at 405–07. "[C]orrectional functions" in the United States, *Richardson* proclaimed, "have never been exclusively public. Private individuals operated local jails in the 18th century, and private contractors were heavily involved in prison management during the 19th century." *Id.* at 405 (internal citations omitted). Importantly, the Court highlighted that "[d]uring that time, some States, including southern States *like Tennessee*, leased their entire prison systems to private individuals or companies which frequently took complete control over prison management, including inmate labor and discipline." *Id.* (emphasis added). This description contradicts *Street*'s and *Skelton*'s perfunctory assertions that running prisons is a "function traditionally reserved to the state." *Skelton*, 963 F.2d at 102; *accord Street*, 102 F.3d at 814.[2]

Fourth, *Skelton* and *Street* are distinguishable because they addresssed the incarceration of adults. Inmates at adult facilities are institutionalized based on criminal convictions and resulting sentences.[3] *See, e.g.*, *Chapman v. United States*, 500 U.S. 453, 465 (1991). Juveniles are different. *See, e.g.*, *Schall v. Martin*, 467 U.S. 253, 265 (1984) (explaining that a juvenile's "interest in freedom from institutional restraints . . . must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody" and "may, in appropriate

---

[2]True, *Richardson* addressed only the qualified-immunity defense and expressly reserved judgment on the state-actor issue given it was assumed below. 521 U.S. at 413. But that caveat does not license ignoring the Court's historical findings about the role private contractors have played in managing prisons. *See also Bell v. Mgmt. & Training Corp.*, 122 F. App'x 219, 223 (6th Cir. 2005) (in a § 1983 case, distinguishing *Skelton*, because, as noted by *Richardson*, "[t]he operation of prisons by private companies is commonplace and has been for many years").

[3]The majority opinion suggests the facility at issue in *Skelton* was a "pretrial detention facility." But the plaintiff there had pleaded guilty to escaping federal custody and was incarcerated while awaiting sentencing. 963 F.2d at 101.

circumstances, be subordinated to the State's parens patriae interest in preserving and promoting the welfare of the child" (internal quotation marks omitted)).   In equating adult incarceration with juvenile care, the majority expands the reaches of our caselaw.

### B.

Michigan law broadly grants state court judges significant authority to remove an at-risk youth from a home and place him in public or private custody.   *See* Mich. Comp. Laws §§ 712A.2, 712A.18.   Here, a state court exercised its jurisdiction over Juan Quintana II and, based on its judgment to promote his "welfare and the best interest of the state," *id.* § 712A.1(3), arranged for his placement into a "child caring institution . . . licensed by the department [of health and human services] to receive for care juveniles," *id*. § 712A.16(2)(b).   That parens patriae action is fundamentally distinct from Michigan's penal prerogatives.

It is also a function that has historical anchors in both public *and* private action.   *See, e.g.*, Lorna Hurl & David Tucker, *The Michigan County Agents and the Development of Juvenile Probation, 1873-1900*, 30 J. of Soc. Hist. 905, 908–09 (1997) (detailing historical efforts in Michigan "to keep children from being admitted to institutions" and providing courts "with several options in dealing with children charged with crimes:  dismissing the charges, or if the children were found guilty, sending them to reform school, finding or cautioning them and sending them home, or authorizing agents to place the children in suitable private homes"); *cf. Howell*, 976 F.3d at 753 (detailing Kentucky's history of relying on "families and private associations to care for Kentucky's young").

Indeed, private companies have apparently long had a hand in operating juvenile facilities.   *See* Jeffrey A. Butts & John Pfaff, *It's About Quality: Private Confinement Facilities in Juvenile Justice*, 18 Crim. & Pub. Pol'y 361, 364 (2019) ("[I]nstitutions for youth were a mainstay of the nation's juvenile justice system well into the twentieth century.  It was not unusual for private organizations to supply institutional space for court-involved youth, and most of the community-based programing for youth was delivered by private agencies." (citation omitted)); *see also* Robert Vinter, George Downs, & John Hall, *Juvenile Corrections in the States: Residential Programs and Deinstitutionalization* 12 (1975) (noting that in 1974, forty-six

states had delinquent juveniles in private care and that those "assigned to private facilities constituted . . . about 10% of those in state-operated facilities"). And that trend continues to this day in Michigan. *See COVID-19 in the Michigan Youth Justice System*, Mich. Ctr. For Youth Just., Wayne State Univ. 2 (May 2020) (noting nearly half of Michigan's juvenile facilities are operated by private entities).

Perhaps Michigan's history is different from that set forth (or from that detailed in our analogous decision in *Howell*, which illustrates how courts must look to history to find state action, 976 F.3d at 752–53). But plaintiffs here made no effort to satisfy their pleading burden by identifying such distinctions, *Marie*, 771 F.3d at 362, and it is not our role to save plaintiffs' defective complaint, *cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (citation and ellipsis omitted)).

## C.

Finally, the majority opinion seeks to fill in the gap between adult prisons and juvenile-detention facilities by following an equally historically barren (and divided) decision from the Eighth Circuit. However, that opinion suffers from the same flaws as today's decision—it lacks any kind of historical analysis and wrongly equates wards-of-the-state juveniles with adjudicated adult prisoners. *See Doe v. North Homes, Inc.*, 11 F.4th 633, 638–39 (11th Cir. 2021).

## III.

For these reasons, plaintiffs have not carried their pleading burden to "advance historical and factual allegations in their complaint giving rise [to] a reasonable inference that [defendants' juvenile detention center performs a function that] is traditionally exclusively in the province of the State" of Michigan. *Marie*, 771 F.3d at 362. Accordingly, the district court correctly dismissed plaintiffs' complaint on the ground that it did not plausibly allege defendants were state actors under 42 U.S.C. § 1983. I would affirm the judgment of the district court and therefore respectfully dissent.