RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0318p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JAMES A. DELANIS,

                                  *Plaintiff-Appellee*,

     *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY,

                                    *Defendant*,

ROBERT J. MENDES, individually and in his capacity as a member of the Metro Council (23-5939); BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC (23-5948),

                            *Defendants-Appellants*.

Nos. 23-5939/5948

_____

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00469—Eli J. Richardson, District Judge.

Argued: October 23, 2025

Decided and Filed: November 24, 2025

Before: SUTTON, Chief Judge; CLAY and GIBBONS, Circuit Judges.
_____

## COUNSEL

**ARGUED:** Allison L. Bussell, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellant Robert Mendes. Robert E. Boston, HOLLAND & KNIGHT LLP, Nashville, Tennessee, for Appellant Baker, Donelson, Bearman, Caldwell & Berkowitz, PC. John I. Harris III, SCHULMAN, LEROY & BENNETTT, P.C., Nashville, Tennessee, for Appellee. **ON BRIEF:** Allison L. Bussell, Melissa Roberge, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellant Robert Mendes. Robert E. Boston, Michael A. Cottone, HOLLAND & KNIGHT LLP, Nashville, Tennessee, for Appellant Baker, Donelson, Bearman, Caldwell & Berkowitz, PC. John I. Harris III, SCHULMAN, LEROY & BENNETTT, P.C., Nashville, Tennessee, for Appellee.

     SUTTON, C.J., delivered the opinion of the court in which GIBBONS, J., concurred. CLAY, J. (pp. 19–27), delivered a separate dissenting opinion.

_____

**OPINION**

_____

SUTTON, Chief Judge.  A Nashville city councilman threatened to withdraw business from a law firm, which served as the city's outside counsel, due to the position one of its attorneys took as the chair of the county election commission on a tax referendum.  When the attorney declined the law firm's request that he oppose the referendum, the firm fired him.  The attorney sued the council member and the law firm for retaliating against his federal free-speech rights, namely his support of the tax-repeal referendum in his capacity as the county election chair.  The district court denied qualified immunity to each defendant in ruling on their motions to dismiss.

The law firm is eligible for qualified immunity in view of the government work it performed.  And it did not violate any clearly established law.  We know of no case in which the First Amendment prohibited a law firm from firing one of its lawyers when the business interests of the firm, including demands from one of its clients, triggered the firing.  We thus reverse that portion of the district court's decision.  On the other hand, the council member's alleged actions violated clearly established law, and we affirm the district court's denial of his motion to dismiss.

I.

This case emerges from a debate over taxes in Nashville, Tennessee.  The Metropolitan Government of Nashville and Davidson County (Nashville for short) governs the city.  Its city council adopted a tax hike in 2020 that would raise property levies by over a third.  Some residents opposed the tax increase.  A citizen group circulated a petition to amend Nashville's charter by referendum to unwind the heightened property taxes and limit future tax increases. Nashville opposed the referendum because it would repeal the tax increase and tie Nashville's fiscal hands in the future.

The referendum required another government entity, the Davidson County Election Commission, to determine whether to certify the proposal for a vote. Among other responsibilities, the Election Commission ensures that a petition complies with state law before placing it on the ballot. *See* Tenn. Code § 2-5-151(c). James DeLanis held one of the Election Commission's five seats and served as its chair. In addition to his role as chair of the Election Commission, DeLanis worked as an attorney at Baker Donelson, a law firm based in Tennessee.

In handling the petition, the Election Commission asked a Tennessee court for a declaratory judgment over whether it met the criteria to qualify for the ballot. Nashville entered the fray as well, asking the court to prevent the Election Commission from certifying the petition. The Tennessee court concluded that the proposed referendum violated Tennessee law and that the Election Commission did not need to place it on the ballot.

The residents who opposed the tax increase did not give up. They sought to cure the defects identified by the state court and submitted a new petition to the Election Commission. Nashville's city council again opposed the effort. One of its members, Robert Mendes, proposed a resolution to combat the renewed petition. His resolution added a poison pill. If the Election Commission permitted the second tax referendum to go on the ballot, his resolution would add a second election option banning *any* future tax referendums, thus barring Nashville residents from ever overturning a property tax increase.

Mendes's efforts did not deter the Election Commission. It concluded that the new citizen tax referendum resolved its previous concerns and voted to certify it for the July 2021 ballot. That decision spurred another legal maneuver. The next day, the mayor and another Nashville officer asked a state court to prohibit the Election Commission from approving the new citizen tax referendum.

The Election Commission held a public meeting a few days later to discuss the second petition. Mendes spoke and, according to DeLanis's complaint, "berated" the Commission's members for their role in this "sham," accusing them of engaging in "political theater designed to feed . . . the ambitions of a small percentage of the county." R.34 ¶ 53. He concluded by warning the Election Commission that "you might get away with it tonight, but we see you, we

see what you're doing and it's not going to stand one way or the other." R.34 ¶ 53. These comments, to DeLanis's eyes and ears, sought to "intimidate" the Election Commission and its members from qualifying the citizen referendum for a vote. R.34 ¶ 54.

At this point, Nashville "officials" reached out to partners at Baker Donelson, the city's outside counsel, to ask for "aid and assist[ance]" in keeping the new citizen tax referendum off the ballot. R.34 ¶ 57. The request extended to "influencing DeLanis as a Commissioner and as the Chair of the [Election] Commission." R.34 ¶ 57. The firm's general counsel, John Hicks, emailed DeLanis that "we need to have a conversation about the current election commission issues and their impact on the firm's representation of [Nashville]." R.34 ¶ 59. Hicks complained to DeLanis about "the mess I have to clean up" due to DeLanis's role on the Election Commission. R.34 ¶ 61. DeLanis's actions, Hicks explained, caused Nashville and its school board—"two major clients of the firm"—to threaten to "pull their business," much to the chagrin of Baker Donelson's partners. R.34 ¶ 62. Hicks also raised potential conflict-of-interest concerns created by DeLanis's roles on the Election Commission and at a law firm representing Nashville.

DeLanis stood his ground. He told Hicks that any attempts to "influence" him or the Election Commission "could be criminal or illegal acts under Tennessee law." R.34 ¶ 68. DeLanis asked Hicks to direct his concerns to Nashville's legal department. Two days after their initial conversation, Hicks told DeLanis that no conflicts in fact existed between DeLanis's role on the Election Commission and his employment with Baker Donelson.

The tax-referendum controversy did not abate. A few weeks later, a Tennessee court sided with Nashville and ruled that the second citizen referendum also suffered from deficiencies that prevented it from appearing on the ballot. The Election Commission scheduled a meeting to decide whether to appeal the ruling. Pleased by the trial court's decision, Nashville officials opposed an appeal. Unspecified city officers or employees asked Baker Donelson to help "ensure" that the Election Commission did not appeal the decision. R.34 ¶ 79. "[O]ne or more" of the subsequent "communications," DeLanis alleges, "were made by, at the direction of or in concert with Mendes." R.34 ¶ 79.

The day before the Election Commission's scheduled meeting, Hicks "asked" DeLanis to abstain from voting on whether to appeal. R.34 ¶ 82. Mendes, that same day, emailed the Election Commission's members and Nashville's city council, "urg[ing]" the Commission not to appeal. R.34 ¶ 86. He "accused" DeLanis of "conducting a pre-baked political circus that was fundamentally anti-democracy." R.34 ¶ 87. He asserted that DeLanis's "intentions" all along were to "push the referendum onto a ballot no matter what." R.34 ¶ 88. The letter also claimed that, "[f]or reasons that seem hyper-partisan," R.34 ¶ 88, DeLanis fired the Election Commission's attorney because he did not provide the counsel DeLanis wanted. Mendes made the letter public and distributed it to media.

Hicks asked to meet DeLanis at the Baker Donelson office on the morning of the meeting: June 25, 2021. DeLanis answered that he would not meet with him without first receiving the meeting's "purpose" in writing because "further discussions" of his "vote at the election commission meeting today" could "put the law firm and its clients in a questionable legal position." R.34 ¶ 98. Hicks responded that DeLanis's time at the firm was coming to an end, leaving him two options: (1) "resigning from the election commission" and staying with the firm for the rest of the fiscal year or (2) "retiring now" from the firm and remaining on the Election Commission. R.34 ¶ 99. When DeLanis asked for more time, Hicks fired DeLanis effective immediately. Hicks told DeLanis he had "no choice," which DeLanis took to mean that Nashville pressured the firm to "retaliate" against him. R.34 ¶¶ 106–07.

DeLanis sued Mendes, Baker Donelson, and Nashville under 42 U.S.C. § 1983 and state law. He brought claims for retaliating against his First Amendment rights, conspiring to deny his freedom of speech, and violating various Tennessee constitutional and statutory provisions.

The defendants moved to dismiss DeLanis's complaint based on qualified immunity. The district court rejected their motions. Of relevance here, the court ruled that Mendes violated clearly established federal free-speech law and that the law firm, as a private entity, could not benefit from qualified immunity. Mendes and Baker Donelson both appeal.

II.

A brief word or two is in order about jurisdiction.  We have jurisdiction over a district court's denial of qualified immunity under the collateral order doctrine.  *Ashcroft v. Iqbal*, 556 U.S. 662, 671–72 (2009).  Qualified immunity shields officers not only from money damages but also from the burdens of litigation and discovery.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  We thus may hear an officer's appeal of a denied motion for qualified immunity, including at the motion-to-dismiss stage.  *Iqbal*, 556 U.S. at 672.

DeLanis insists that we may not hear this appeal because Mendes's and Baker Donelson's arguments raise questions of fact under *Johnson v. Jones*, 515 U.S. 304, 307 (1995). Whatever the parameters of that decision, it applies only to cases that reach summary judgment. "The concerns that animated the decision in *Johnson* are absent when an appellate court considers the disposition of a motion to dismiss a complaint for insufficient pleadings." *Iqbal*, 556 U.S. at 674.  Because we must credit all well-pleaded facts at the pleading stage, no factual disputes exist and *Johnson* thus is "not triggered." *Myers v. City of Centerville*, 41 F.4th 746, 757 (6th Cir. 2022); *see, e.g.*, *Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021).

III.

As to the merits, we ask whether Mendes and Baker Donelson may benefit from qualified immunity and, if so, whether they violated DeLanis's clearly established free-speech rights.

A.

Qualified immunity protects public officials and those serving the public from "the time, expense and risk of money-damages actions" if they did not violate the claimant's clearly established federal constitutional rights. *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quotation omitted).  Lawsuits against "individual government officials" in their personal capacities, generally speaking, implicate the defense. *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 143 (6th Cir. 2023) (quotation omitted).  When private attorneys and law firms provide legal services to a government body, they also are eligible for qualified immunity in connection with that work. *Cullinan v. Abramson*, 128 F.3d 301, 310 (6th Cir. 1997); *see*

*Filarsky v. Delia*, 566 U.S. 377, 393–94 (2012).   The defense extends to actions taken while "performing discretionary functions" of office.   *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) (quotation omitted).   The defense thus turns on the function of the individual's work, not the individual's job title.   So it is that a city official does not receive qualified immunity for private actions taken outside that official's job, while a private lawyer does receive qualified immunity for public actions taken in service of a government client.   *See generally Filarsky*, 566 U.S. at 389–94.

Qualified immunity covers these claims against Mendes and Baker Donelson.   Mendes served as a Nashville council member and the complaint alleges that he used his government position to violate DeLanis's constitutional rights.   *See Moore*, 126 F.4th at 1166–67.   Baker Donelson served as outside counsel for the Nashville government, and allegedly fired DeLanis on its behalf.   *See Cullinan*, 128 F.3d at 310.   Both Mendes and Baker Donelson thus may raise the defense.

In seeking to head off this conclusion, DeLanis argues that his independent requests for a declaratory judgment and an injunction defeat qualified immunity.   But this misapprehends how qualified immunity works.   The defense, all agree, protects defendants from claims for money damages.   *Tolan v. Cotton*, 572 U.S. 650, 654 (2014) (per curiam).   An *additional* request for declaratory and injunctive relief does not suddenly remove the qualified-immunity defense from an *existing* request for money damages.   The existence of a money-damages claim suffices by itself to trigger qualified immunity, no matter what other claims for relief the plaintiff raises.

DeLanis adds that neither defendant acted within the scope of their discretionary functions, thereby piercing any qualified-immunity defense.   But both defendants carried out "discretionary functions" within the scope of their duties when playing their alleged part in DeLanis's departure from the law firm.   *See Poe v. Haydon*, 853 F.2d 418, 423 (6th Cir. 1988). One does not have to look far for evidence of the public functions that each defendant performed.   All of it comes from DeLanis's own complaint and the allegations he makes in support of his § 1983 claims.

Start with Mendes. The allegations in the complaint offer one example after another of Mendes's serial public actions in favor of preserving Nashville's property-tax increase. Mendes proposed the city budget that initiated the tax increase. He introduced a poison-pill resolution to deter the Election Commission from qualifying a citizen tax referendum that would have repealed the tax increase. Mendes spoke as a city councilmember to criticize the Election Commission's handling of the tax referendum. He signed a letter as a "[Nashville] Council[] At Large member" that denounced DeLanis's work on the Election Commission. R.34 ¶ 85. All the while, Mendes sat on Nashville's city council, which has authority to support these public functions and authority over the city's decision to retain outside counsel. *See* Metro. Gov. of Nashville & Davidson County Charter § 8.607; Metro. Gov. of Nashville & Davidson County Code of Ordinances § 4.08.080(A)–(C).

Turn to Baker Donelson. Here, too, the complaint tells us all we need to know. Nashville retained Baker Donelson as outside counsel and remained a "client" of the firm "[d]uring all times relevant to" DeLanis's claims. R.34 ¶¶ 26–27. Nashville officials asked Baker Donelson "to aid and assist" its efforts to preserve the tax increase "by influencing DeLanis as a Commissioner." R.34 ¶ 57. Those officials remained "in contact with Baker Donelson" about its work implementing the city's policy of opposing the citizen tax referendum. R.34 ¶ 94. Baker Donelson ultimately fired DeLanis "by and pursuant to" Nashville's "demands and requests." R.34 ¶ 114. That decision was "so intertwined" with Nashville's policy of opposing the citizen tax referendum that DeLanis "attributed" it to Nashville. R.34 ¶¶ 165, 170–71. To the extent the law firm functioned as a state actor subject to First Amendment liability when representing Nashville, as DeLanis alleges, the ability to manage its staff undoubtedly fell within its discretionary powers as well.

DeLanis separately invokes *Clinton v. Jones* to show that qualified immunity does not apply. 520 U.S. 681, 694–95 (1997). But that is a case about *absolute* immunity for *presidents*. That precedent has nothing to offer here.

DeLanis separately insists that Mendes and Baker Donelson abused their authority. But this allegation—that the defendants broke the law by firing him—does not remove qualified

immunity from the stage. Otherwise, no official could benefit from the defense. Every lawsuit that states a viable claim "alleges a misuse of power, because no state actor has the authority to deprive someone of a federal right." *Lindke v. Freed*, 601 U.S. 187, 200 (2024).

DeLanis claims that qualified immunity does not apply because the defendants knowingly violated the law. But the Supreme Court abandoned a subjective approach to qualified immunity decades ago. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982). Today, DeLanis faces a different, and in truth lighter, burden. All he must show is that Mendes and Baker Donelson violated an objective standard—that they violated "clearly established law." *See id.* at 818.

DeLanis's last bid for removing qualified immunity from the case focuses on Baker Donelson. Noting that the law firm is a private entity, he claims that the defense necessarily does not apply. In doing so, he points to a statement in *Nugent v. Spectrum Juvenile Justice Services* that qualified immunity is "unavailable" in this setting, namely when a private entity performs a government function. 72 F.4th at 144. But *Nugent* involved *Monell* liability. Qualified immunity does not apply in that setting. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *see Owen v. City of Independence*, 445 U.S. 622, 638 (1980).

The words "qualified immunity," notably and understandably, never appear in the § 1983 section of *Nugent*. No surprise, then, the decision never explains why a private entity could be sued under § 1983 for performing a public function but could never receive qualified immunity for that public function. The one time the words "qualified immunity" appear is when the opinion "briefly comment[s] on" a few issues that we "remand[ed] for the district court to address . . . in the first instance." *See Nugent*, 72 F.4th at 143. The decision is not a qualified-immunity case and does not purport to be one.

*United Pet Supply, Inc. v. City of Chattanooga* is of a piece with *Nugent* and does not help DeLanis either. 768 F.3d 464 (6th Cir. 2014). It concerned "the unavailability of qualified immunity as a defense in an official-capacity suit." *Id.* at 484. As with *Monell* claims, official-capacity claims never give rise to a qualified immunity defense. *See Kentucky v. Graham*, 473

U.S. 159, 166–67 (1985). *United Pet Supply* reaffirmed our cases granting qualified immunity to private entities in individual-capacity lawsuits. 768 F.3d at 484 n.3.

Further alleviating doubt about the point is our earlier holding in *Cullinan v. Abramson*, 128 F.3d at 310. *Cullinan* raised this question: Does the "outside counsel" status of several "lawyers and their firm" make them "ineligible for qualified immunity," notwithstanding their work for the City of Louisville and notwithstanding the reality that the lawsuit arose from their work for the City? *Id.* No, we answered, and permitted the lawyers and law firm to raise the defense. *Id.* The Supreme Court, we reasoned, explained that "the common law '*did* provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign.'" *Id.* (quoting *Richardson v. McKnight*, 521 U.S. 399, 407 (1997)). As a result, "[t]he rationales for qualified immunity apply to these lawyers and their firm in about the same way they apply to" traditional government officers. *Id.* We saw "no good reason to hold the city's in-house counsel eligible for qualified immunity and not the city's outside counsel." *Id.*

Since *Cullinan* and *Richardson*, the Supreme Court has removed the last vestige of doubt about whether a private entity is eligible to receive qualified immunity when it handles public functions that might expose it to § 1983 liability. In *Filarsky v. Delia*, the Court reviewed a Ninth Circuit decision that expressly rejected *Cullinan* and that held that private attorneys are not eligible for qualified immunity. 566 U.S. at 382–83. The Supreme Court overruled the Ninth Circuit. It held that qualified immunity applied to a private attorney working for a city even though he was not a "full-time employee." *Id.* at 393–94. In the process, the Court explained the common-sense principle that private actors generally receive the bitter and the sweet in defending constitutional torts. If a private actor is liable to a lawsuit as a state actor, it should also benefit from a state actor's defenses. *Id.* at 389–91. "[I]mmunity . . . should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Id.* at 389. That conclusion flowed from the history of officer immunity. Due to the small size of nineteenth-century governments, states delegated many public functions to private parties who received the same defenses as their public-official counterparts. *Id.* at 385–89.

DeLanis persists that the law firm in *Cullinan* operated as a partnership and that Baker Donelson operates as a Tennessee professional corporation. But he provides no authority for the novelty that *Cullinan* turns on the law firm's legal form as opposed to the government function it performs. We later described the law firm in *Cullinan*, at any rate, as a "corporate" defendant that nonetheless properly received qualified immunity. *United Pet Supply*, 768 F.3d at 484 n.3. Regardless of whether this later characterization listed the entity's form correctly, it confirms that a law firm's form of organization does not by itself defeat qualified immunity. *See id.*

DeLanis argues in the alternative that, even if a private law firm may be eligible for qualified immunity, the immunity attaches only if outside counsel "act[ed] at the behest of the state." *Cooper v. Parrish*, 203 F.3d 937, 952 (6th Cir. 2000). No record-supported facts, DeLanis adds, show that Baker Donelson acted as an agent for the city in firing him. But this argument collides with the words of his complaint. DeLanis premises his free-speech claim against Baker Donelson on its "close relationship" with Nashville and his allegation that it fired him "pursuant to" Nashville's "Anti-Referendum Policy." R.34 ¶¶ 114, 171. Nashville officials first asked Baker Donelson, its outside counsel, to "influenc[e]" DeLanis to side against the citizen tax referendum on the Commission. R.34 ¶ 57. Once that failed, the firm fired him on Nashville's behalf so that his removal "should be attributed to [the city.]" R.34 ¶ 171.

In *Cooper*, in marked contrast, "little—if any—evidence" showed that a private attorney "was acting at the behest of the state" when filing complaints against the nightclubs at issue in that dispute. *Cooper*, 203 F.3d at 952. Not so for Baker Donelson. It served as the city's outside counsel, took marching orders on firing DeLanis from city officials, carried out Nashville's policies in the process, and fired him in a way "attributed" to Nashville. R.34 ¶ 171.

Nor does this conclusion undermine the reasons we have qualified immunity. The Supreme Court tells us why. If qualified immunity protected government employees but not "private" actors "working alongside them" from facing "full liability" for the same activities under § 1983, "any private individual with a choice might think twice before accepting a government assignment." *Filarsky*, 566 U.S. at 391. DeLanis may not claim that Baker Donelson acted on behalf of Nashville when it helps him (in providing a premise for suing it

under § 1983) and deny that connection when it hurts him (in denying that qualified immunity applies).

Our colleague dissents solely on this ground, arguing that "the defense of qualified immunity is available only to government officials." Dissent at 19. We respectfully disagree. In no uncertain terms, the Supreme Court held in *Filarksy* that a "private individual[]," even "[t]hough not a public employee," received qualified immunity. *Filarsky*, 566 U.S. at 393–94. That explains why the dissent does not cite any Supreme Court cases for the assertion that private actors may never invoke qualified immunity. *Richardson* does not fill that gap. In that "self-consciously 'narrow[]' decision," in the words of *Filarsky*, "[t]he Court made clear that its holding was not meant to foreclose all claims of immunity by private individuals." *Id.* at 393 (quoting *Richardson*, 521 U.S. at 413.).

Nor are we making the same mistake by creating a blanket rule in the other direction—by holding that private actors *always* receive qualified immunity. Consistent with prior United States Supreme Court and Sixth Circuit rulings, we hold only that, on this record, Baker Donelson is eligible to invoke qualified immunity. That is all. It is DeLanis's allegations in his complaint, notably, that establish this eligibility—that the law firm served as outside counsel for Nashville, that Nashville wished to punish DeLanis's free-speech advocacy for the tax-repeal referendum, that the law firm acceded to the government's request to fire DeLanis, and that the law firm did so "pursuant to" Nashville's request, all of which made it appropriate for the law firm's actions to "be attributed" to Nashville. R.34 ¶¶ 114, 171. This application of existing precedent makes no new law when it comes to eligibility for qualified immunity.

But if that is so, the dissent worries, how could we also conclude that the law firm did not violate clearly established law? That is a different question. The first question is whether a private entity serving a public client may ever be eligible for qualified immunity. It may be, as many cases make clear and as we explain above. The second question is whether the law firm's conduct violated clearly established free-speech guarantees. That is a different inquiry—about the meaning of the underlying constitutional protection—and it is the one to which we now turn.

B.

That Mendes and Baker Donelson are eligible for qualified immunity is one thing.  It is a separate matter whether the defense applies to their actions.  We must consider whether they violated DeLanis's First Amendment rights and whether they violated clearly established law in doing so.  *Moore*, 126 F.4th at 1167.  To prove a clearly established violation, the claimant must show that the right's contours were "sufficiently clear that every reasonable official would have understood" that he was violating it.  *Reichle v. Howards*, 566 U.S. 658, 664–65 (2012) (quotation omitted).  DeLanis can do so by identifying a case "with facts similar enough that it squarely governs this one."  *Moore*, 126 F.4th at 1167 (quotation omitted).  In assessing the defense, we accept the complaint's factual allegations as true and draw all reasonable inferences in DeLanis's favor.  *Hudson v. City of Highland Park*, 943 F.3d 792, 798 (6th Cir. 2019).

DeLanis must make three showings to succeed on his First Amendment retaliation claims.  *Cunningham v. Blackwell*, 41 F.4th 530, 541 (6th Cir. 2022).  He must allege that he engaged in protected speech.  *Id.*  He must allege that he suffered an "adverse action" that would "dissuade individuals of ordinary firmness from doing what they were doing."  *Id.* (quotation omitted).  And he must allege a "causal link" between his protected speech and the adverse action.  *Id.*

*Mendes*.  Mendes does not deny that DeLanis engaged in protected activity when speaking as chair of the Election Commission.  *See* R.72 at 25.  The First Amendment, generally speaking, protects public speech, including by officeholders.  *See Lindke*, 601 U.S. at 196–97.  Because Mendes, and for that matter Baker Donelson, do not deny that DeLanis engaged in protected speech, we need not address the free-speech complications that sometimes arise when an officeholder speaks in his official capacity.  *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 417–26 (2006) (The First Amendment does not protect public employees speaking "pursuant to their official duties."); *Doe v. Reed*, 561 U.S. 186, 220–23 (2010) (Scalia, J., concurring in the judgment) (finding "no precedent from this Court holding that legislating is protected by the First Amendment"); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125–129 (2011)

("reject[ing] the notion that the First Amendment confers a right to use governmental mechanics to convey a message").

DeLanis also alleges that he suffered an "adverse action." *See Cunningham*, 41 F.4th at 541 (quotation omitted). When a public official warns a law firm that the city may pull business from it due to the public-office actions of one of its lawyers, that suffices to deter a person "of ordinary firmness" from exercising his First Amendment rights in that office. *See id.* Nor can Mendes fairly deny that DeLanis's firing was a "reasonably foreseeable consequence" of his threats to the firm. *Paige v. Coyner*, 614 F.3d 273, 280 (6th Cir. 2010).

DeLanis also alleges that Mendes took the adverse action "in response to [his] protected activity." *See Stockdale v. Helper*, 979 F.3d 498, 506 (6th Cir. 2020). The complaint alleges that Nashville officials "threaten[ed] to pull business from the firm" and "wanted the firm's assistance to make certain that DeLanis would" not harm their interests in his role on the Election Commission. R.34 ¶ 96. Based on these comments, the complaint alleges, Baker Donelson fired DeLanis. DeLanis connected Mendes to those threats, alleging that the Nashville officials who threatened Baker Donelson "includ[ed]" Mendes. R.34 ¶¶ 95–96. The factual allegations in the complaint permit the plausible inference that Mendes was involved in the threats. Mendes strongly opposed the citizen tax referendum, forcefully rebuked DeLanis for his work on the Commission, and served as a councilmember of a city whose "officials" made the threats. R.34 ¶¶ 79, 95–96.

Mendes's alleged conduct also violated clearly established law. We have left no doubt that causing an employee's firing due to his protected speech violates the First Amendment. *Kubala v. Smith*, 984 F.3d 1132, 1139–40 (6th Cir. 2021). To be "discharge[d]" for speech is a textbook example of an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc). Mendes had ample notice that pressuring an employer to fire an employee in retaliation for his protected speech ran afoul of the Free Speech Clause. DeLanis, then, tied Mendes's actions to a "specific," *Reichle*, 566 U.S. at 665, adverse action recognized by existing law: causing an employee to be fired due to his speech.

Case law confirms this conclusion. In *Paige v. Coyner*, an accountant drew the ire of a county official by opposing a new highway project. 614 F.3d at 275–76. The official retaliated by calling the accountant's employer and lying about what the accountant had said "with the intent of having [her] fired." *Id.* at 276–77. The official succeeded; the accountant's firm fired her a few days later. *Id.* at 277. We concluded that the accountant had alleged enough in her complaint to proceed to discovery. *Id.* at 280–83. "Losing one's job and accompanying benefits," we explained, "is certainly severe enough to deter a person of ordinary firmness" from speaking freely. *Id.* at 281. DeLanis likewise alleges that Mendes spoke to Baker Donelson's leadership in a way that would foreseeably lead to his removal from the firm and that the firm pushed him out as a result.

Mendes's response that our cases have not dealt with a *public official* fired from his private job in retaliation for his speech does not advance the ball. Our cases plainly established that Mendes could not fire DeLanis for his speech if DeLanis worked for him at the city or if DeLanis worked only for him through a private business. *See Thaddeus-X*, 175 F.3d at 396; *Paige*, 614 F.3d at 281. This case parallels *Paige*. As in that case, DeLanis worked for a private firm, and Mendes caused him to be fired. The reality that DeLanis also served as a public officer does not transform a clearly adverse action into innocent conduct.

Mendes adds that DeLanis did not adequately allege that he threatened Baker Donelson. He points out that DeLanis admits that Baker Donelson never told him who at Nashville made the threats. But DeLanis has done enough at the pleading stage to connect Mendes to the threats against Baker Donelson and his removal from the firm. Based on the statements of Baker Donelson's general counsel, DeLanis alleged that the Nashville "officials" who spoke to Baker Donelson "includ[ed]" Mendes and that other officials acted "at the direction of or in concert with Mendes." R.34 ¶¶ 79, 95–96. That conclusion plausibly follows from the factual allegations in the complaint. Mendes spearheaded an effort to defeat the citizen tax referendum at issue. He "berated" DeLanis at a Commission meeting for orchestrating "pre-baked, political theater." R.34 ¶ 53. He circulated a public letter accusing DeLanis of firing the Commission's counsel for the "hyper-partisan" reason of "push[ing] the referendum onto a ballot no matter what." R.34 ¶ 88. He denounced DeLanis's work as "fundamentally anti-democracy." R.34

¶ 87. And Mendes served as a councilmember of the city government whose "officials" made the threats. R.34 ¶¶ 79, 95–96. Mendes's frustration with DeLanis and hearty opposition to his conduct on the Commission make it plausible that he was one of the Nashville officials, if not the key Nashville official, who threatened Baker Donelson.

Mendes nonetheless insists that we cannot plausibly draw this inference. Pointing to *Bell Atlantic Corp. v. Twombly*, he notes that an allegation of parallel business conduct in that case did not support an inference that telephone companies conspired to fix prices. 550 U.S. 544 (2007). But the single-step inference required in today's case looks nothing like the multi-step inferences the plaintiffs sought to string together to allege price-fixing in *Twombly*.

Even if Mendes participated in Nashville's communications with Baker Donelson, he maintains that those discussions did not necessarily involve threats. "What if, for example, Baker Donelson wildly misinterpreted Councilmember Mendes's alleged request for help," Mendes muses, "or simply overreacted and terminated [DeLanis's] employment on its own?" Mendes's Reply Br. 16. That is precisely the kind of question that lends itself to the discovery process. For now, we must credit DeLanis's plausible allegations that Nashville officials, "including" Mendes, told Baker Donelson to change DeLanis's tune while "threatening to pull business from the firm." R.34 ¶¶ 95–96. After discovery, Mendes is free to argue at summary judgment that the firing arose from a misunderstanding.

*Baker Donelson*. DeLanis, by contrast, has not shown that Baker Donelson violated clearly established law. Whether the law firm's action violated the First Amendment need not detain us. So long as its actions did not violate clearly established law, qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The allegations against Baker Donelson present a unique situation not addressed by our cases to date. Whether Baker Donelson acted honorably or not in firing DeLanis, it did not have clear notice that a law firm (or private company) violates the First Amendment by firing an employee when a government client threatens to take its business elsewhere if the employee continues to act adversely to the government. Baker Donelson, for better or worse, sought to protect its client base, not to punish DeLanis for his speech. As DeLanis acknowledges in his

complaint, Baker Donelson's business interests drove its conduct. The firm, in his words, "sought to maintain and increase the client revenue it generated" from Nashville at "all times relevant to the claims." R.34 ¶ 31. We know of no free-speech case that covers this unusual setting, and DeLanis does not identify one himself.

What he does identify are cases that are several material steps removed from this one. *See Paige*, 614 F.3d at 275–76; *MacIntosh v. Clous*, 69 F.4th 309, 315 (6th Cir. 2023); *Anders*, 984 F.3d at 1175; *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994). None of them involves law firms or companies responding to government threats to their client base. None of them deals with a for-profit entity responding to client pressure. And none of them addresses alleged constitutional violations by a private employer.

Return to *Paige* to see the distinction. In that case, a public official lied to an employer to punish an employee's speech. *Paige*, 614 F.3d at 275–76. That situation does not tell us what to do when a government client tells a for-profit entity to end an employee's public opposition to a key initiative of that government or run the risk of losing its business. Recall that Baker Donelson, according to the complaint, fired an employee (DeLanis) to protect its business interests with that client and never took a public position on the benefits or not of the tax referendum. That is an unprecedented situation, one we need not resolve today.

*Anders v. Cuevas* does not change things. In that case, the Michigan State Police removed a towing company from its rotation of contractors because its owner reported that he gave sporting tickets to state troopers. 984 F.3d at 1171–72. Although *Anders* involved a private business, the company was the victim rather than the perpetrator. Opposition to protected speech, moreover, prompted the public official's action. *Anders* does not tell us what to do when a private business does work for the government and seeks to preserve that business and support its client's (the government's) interests.

*Zilich v. Longo* is further afield. It involved an elected official's actions, not personnel decisions by a private company, and it addressed retaliation against disfavored speech, not a response to client pressure. *See* 34 F.3d at 360–61.

Acknowledging the "novel factual circumstances" of this case, DeLanis's Br. 48, DeLanis invokes *Hope v. Pelzer*, claiming that the illegality of Baker Donelson's actions was "so obvious" that no case needed to establish it. 536 U.S. 730, 741 (2002). He likewise invokes *Sexton v. Cernuto*, where we held that a work-release program facilitating sexual assault violated clearly established law "even without materially similar cases." 18 F.4th 177, 182–83, 192–93 (6th Cir. 2021).

Neither case saves DeLanis's claims against Baker Donelson. The facts of both cases far outstrip what DeLanis suffered here. *Hope*, an Eighth Amendment case about handcuffing a prisoner to an outdoor post under the Alabama summer sun for hours on end, is a "rare" outlier. 536 U.S. at 733–34, 741; *Dist. of Columbia v. Wesby*, 583 U.S. 48, 64 (2018). And *Sexton* involved egregious sexual misconduct. 18 F.4th at 192–93. Neither case remotely shows that a law firm seeking to protect an existing client must continue to work with an employee whose public actions undermine that client's interests.

We affirm the denial of qualified immunity for Mendes on DeLanis's retaliation claims, reverse the denial of qualified immunity to Baker Donelson, and remand.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting.  The majority's extension of qualified immunity to the law firm in this case, Baker Donelson, marks a significant departure in our longstanding jurisprudence.  I therefore respectfully dissent on the issue of whether Baker Donelson is entitled to qualified immunity.

We have long recognized that the defense of qualified immunity is available only to government officials and only where those government officials are sued in their individual capacities.  *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[T]he doctrine of qualified immunity safeguards only certain *natural person* defendants in their individual capacities."); *Benison v. Ross*, 765 F.3d 649, 665 (6th Cir. 2014) (citation omitted) ("Qualified immunity is a personal defense that applies only to government officials in their individual capacities."); *Ermold v. Davis*, 936 F.3d 429, 436 (6th Cir. 2019) ("Qualified immunity protects government officials from lawsuits against them in their *individual* capacities.") (citing *McCloud v. Testa*, 97 F.3d 1536, 1539 n.1 (6th Cir. 1996) (holding that "qualified immunity applies only to an official's liability in his individual capacity)); *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 484 (6th Cir. 2014) ("We have always understood qualified immunity to be a defense available only to individual government officials sued in their personal capacity.").

This Court also re-affirmed this rule in *Nugent v. Spectrum Juvenile Justice Services*, 72 F.4th 135 (6th Cir. 2023), wherein this Court "briefly comment[ed]" that the private entity plaintiff "invoked qualified immunity, but that defense 'is available only to individual government officials sued in their personal capacity.'"  *Id.* at 143 (quoting *United Pet Supply, Inc.*, 768 F.3d at 484).  The majority avoids this caselaw by remarking that the Court mentions qualified immunity only when briefly commenting on the issue, and the decision "is not a qualified-immunity case." Majority Op. at 9.  But a published decision need not discuss an issue at length, nor resolve an issue in the first instance, to recognize a governing standard in an area

of law.  The majority recognizes this notion, as it still relies on *Nugent* in their rule statement on qualified immunity.  *See id.* at 6.  In any event, we need not rely on *Nugent* to illustrate that this Circuit has consistently recognized that "[q]ualified immunity is a personal defense that applies only to government officials in their individual capacities."  *See, e.g.*, *Benison*, 765 F.3d at 665.

Following our longstanding rule that qualified immunity is available only to individual government officials, we have consistently held that the defense is not available to public entities or governmental bodies.  *Marsh v. Arn*, 937 F.2d 1056, 1071 (6th Cir. 1991) ("[W]e recognize that the doctrine of qualified immunity extends its protection only to individuals and not to state or for that matter local government."); *Everson v. Leis*, 556 F.3d 484, 501 n.7 (6th Cir. 2009) ("As qualified immunity protects a public official in his individual capacity from civil damages, such immunity is unavailable to the public entity itself."); *Smith v. Leis*, 407 F. App'x 918, 928 (6th Cir. 2011) ("A government entity cannot claim any personal immunities, such as . . . qualified immunity."); *Harrill v. Blount Cnty., Tenn.*, 55 F.3d 1123, 1126 (6th Cir. 1995) ("Qualified immunity is not available to municipal governments."); *see Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 523 (6th Cir. 2013) ("Lakewood is not eligible for qualified immunity because it is a city, not an individual.").

In deciding whether to extend qualified immunity in a given case, the Supreme Court has instructed us to consider "the special policy concerns involved in suing government officials," and explained that the defense protects "the government's ability to perform its traditional functions."  *Wyatt v. Cole*, 504 U.S. 158, 167 (1992) (citations omitted).  The "special policy concerns" that mandate qualified immunity include preserving their "ability to serve the public good," ensuring "that talented candidates were not deterred" from entering public service because of the threat of a damages suit, and preventing "the distraction of officials from their governmental duties."  *Id.* (citations omitted).  In other words, qualified immunity "acts to safeguard government, and thereby protect the public at large, not to benefit its agents."  *Id.* at 168.  Thus, in *Wyatt*, the Supreme Court declined to extend qualified immunity to private defendants because, unlike school board members, police officers, or presidential aides, "private parties hold no office requiring them to exercise discretion," nor "are they principally concerned

with enhancing the public good," so the "rationales mandating qualified immunity for public officials are not applicable to private parties." *Id.* at 167-68.

Following that Supreme Court precedent, we have thus recognized that the defense of qualified immunity is generally unavailable to private parties. *Derfiny v. Pontiac Osteopathic Hospital*, 106 F. App'x 929, 937 (6th Cir. 2004) ("[S]ince qualified immunity is reserved for state actors, private litigants are generally not eligible to receive qualified immunity . . . ."); *Stack v. Killian*, 96 F.3d 159, 163 (6th Cir. 1996) ("Qualified immunity is generally not available to private parties."). Even where a private entity is "acting in a governmental capacity," we have recognized that qualified immunity is unavailable to that private entity. *United Pet Supply, Inc.*, 768 F.3d at 484.

For example, in *Richardson v. McKnight*, the Supreme Court held that a privately run, for-profit prison that contracted with the state to provide services could not assert qualified immunity in a lawsuit involving that work on behalf of the state. 521 U.S. 399, 412 (1997). In holding that the private defendants were not entitled to qualified immunity, the Court emphasized that qualified immunity is not appropriate where "a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Id.* at 413.

Under this governing case law, Baker Donelson is not entitled to qualified immunity. Baker Donelson is a law firm, not a "*natural person* defendant," *Scott*, 205 F.3d at 879, or a "government[] official," *Benison*, 765 F.3d at 665. Rather, Baker Donelson is a private party for which "[q]ualified immunity is generally not available." *Stack*, 96 F.3d at 163; *Derfiny*, 106 F. App'x at 937. Similar to the "private firm" in *Richardson*, Baker Donelson is private law firm that, in representing its government client, Nashville, is "systematically organized to assume . . . [legal] task[s]" and undertakes those tasks "for profit and potentially in competition with other firms." *Richardson*, 521 U.S. at 413. Even if Baker Donelson's representation of a government client qualifies the firm as "acting in a governmental capacity," the law firm is still a "private entity" that cannot assert qualified immunity. *United Pet Supply, Inc.*, 768 F.3d at 484.

The majority contends that qualified immunity extends to not only public officials, but also anyone serving the public from the time, expense, and risk of money-damages actions if they did not violate the claimant's clearly established federal constitutional rights. Majority Op. at 6. To support this proposition, the majority cites *Moore v. Oakland County*, wherein we stated, "Qualified immunity spares *officers* from the time, expense and risk of money-damages actions unless they violate clearly established constitutional rights." 126 F.4th 1163, 1167 (6th Cir. 2025) (emphasis added) (citation and quotation removed). We further stated that, to overcome the defense, a plaintiff must show that "the *officers*" violated a clearly established constitutional right. *Id.* (emphasis added). *Moore*, therefore, provides no support for the majority's contention that any party besides a public officer or official can assert qualified immunity.

The majority creates a new legal rule, never before held by the Supreme Court or this Circuit: "When private attorneys and law firms provide legal services to a government body, they also are eligible for qualified immunity in connection with that work." Majority Op. at 6. The majority cites *Filarsky v. Delia*, 566 U.S. 377 (2012) and *Cullinan v. Abramson*, 128 F.3d 301 (6th Cir. 1997) in support of this statement. But neither *Filarsky* nor *Cullinan* support such a broad holding or the extension of qualified immunity to Baker Donelson in this case.

In *Filarsky*, the city hired a private attorney to assist in an official investigation into the plaintiff's potential wrongdoing. 566 U.S. at 380-81. Based on actions that took place in the investigation, the plaintiff brought a § 1983 action against the private attorney, in addition to the city and other defendants. *Id.* at 382. The Supreme Court held that "there is no dispute that qualified immunity is available for the sort of investigative activities at issue." *Id.* at 384 (citation omitted). The Court reasoned that the "common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Id.* at 387. The Court distinguished the case from *Wyatt* because, "[u]nlike the [private] defendants in *Wyatt*, who were using the mechanisms of government to achieve their own ends, individuals working for the government in the pursuit of government objectives are 'principally concerned with enhancing the public good.'" *Id.* at 392 (quoting *Wyatt*, 504 U.S. at 168). The Court also distinguished the case from *Richardson*

because none of the particular circumstances of that case—"a private firm, systematically organized to assume a major lengthy administrative task . . . with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"—were present.  *Id.* at 393 (quoting *Richardson*, 521 U.S. at 413).  The Court thus extended qualified immunity to the private attorney.  *Id.* at 394.  Justice Sotomayor stated in concurrence: "I add only that it does not follow that *every* private individual who works for the government in some capacity necessarily may claim qualified immunity when sued under 42 U.S.C. § 1983. Such individuals must satisfy our usual test for conferring immunity. As the Court explains, that test looks to the general principles of tort immunities and defenses applicable at common law, and the reasons we have afforded protection from suit under § 1983." *Id.* at 397 (citations and quotations omitted) (citation modified).

Filarsky does not support extending qualified immunity to Baker Donelson in this case. The events "at issue" in this case involve Plaintiff's employment and termination at his own law firm, not any particular investigative or legal work that Baker Donelson carried out in coordination with the government.  *See Filarsky*, 566 U.S. at 384.  At oral argument, Baker Donelson stated that its only motivation for terminating Plaintiff's employment was its own business interests.  Under the facts of this case, Baker Donelson functioned neither as a "public servant[]" nor a "private individual[]" that is "engaged in public service" or "carrying out government responsibilities." *See id.* at 387.  Although the Court found *Wyatt* and *Richardson* distinguishable in *Filarsky*, those cases are not distinguishable here.  Like the defendants in *Wyatt*, Baker Donelson used its representation of the government to achieve its own ends and was not "principally concerned with enhancing the public good." *See* 504 U.S. at 168.  As already stated, like the defendants in *Richardson*, Baker Donelson is "a private firm" that, in representing its government client, Nashville, is "systematically organized to assume . . . [legal] task[s]" and undertakes those tasks "for profit and potentially in competition with other firms." 521 U.S. at 413.  Thus, *Filarsky*'s extension of qualified immunity to a single attorney in a lawsuit involving actions taken in the course of an investigation with the government does not support an extension of qualified immunity to an entire law firm in this lawsuit involving the alleged wrongful termination of its own employee.

Nor does *Cullinan* support an extension of qualified immunity to Baker Donelson in this case. In *Cullinan*, the plaintiffs brought claims under RICO and § 1983 for wrongful use of civil proceedings, abuse of process, and other related issues against city government actors based on actions that took place during the plaintiffs' prior litigation against the city. 128 F.3d at 305-07. The plaintiffs also named a law firm as a defendant because that law firm had represented the city in the course of the prior litigation and had filed the initial lawsuit on behalf of the city. *Id.* at 306, 310. In considering whether the law firm was entitled to assert qualified immunity, this Court acknowledged that "private litigants are not eligible for immunity from suit under § 1983 . . . in most factual contexts." *Id.* at 310 (citing *Duncan v. Peck*, 844 F.2d 1261 (6th Cir. 1988)). Given the factual circumstances of the case, however, this Court held that in filing a lawsuit on behalf of the city and acting "[a]s attorneys for the city" in the prior litigation that gave rise to the plaintiff's claims, the law firm was acting at "the behest of the sovereign," and therefore this Court saw "no good reason" to find city government actors eligible for qualified immunity and not the law firm. *Id.* at 310 (quoting *Richardson*, 521 U.S. at 407).

It is true that, under *Cullinan*, Baker Donelson may act at "the behest of the sovereign" in filing a lawsuit on behalf of their government client or otherwise carrying out legal work for their government client. *See id.* But Baker Donelson does not perform a public function in managing internal, human-resources affairs at the law firm, such as making employment decisions. The government may have been a client of the firm, and Baker Donelson may have considered that client relationship in choosing to fire Plaintiff. But Baker Donelson does not perform a public duty or act "at the behest of the sovereign" by firing Plaintiff, especially since Baker Donelson's sole motivation for Plaintiff's termination was its own private business interests. *See id.* Again, this lawsuit does not arise out of any particular legal work that Baker Donelson carried out on behalf of the government, as in *Cullinan*. This lawsuit arises out of an employment relationship between an attorney and his own law firm, and *Cullinan* does not empower the extension of qualified immunity to a law firm in a case involving its internal employment decision that was motivated by its own business interests.

Since *Filarsky* and *Cullinan*, we have held that "when a private party—including a private person working for the government part-time, *Filarsky v. Delia*, 566 U.S. 377, 393-94

(2012)—seeks qualified immunity from a § 1983 suit, we determine whether (1) there was a firmly rooted history of immunity for similarly situated parties at common law; and (2) whether granting immunity would be consistent with the history and purpose of § 1983." *McCullum v. Tepe*, 693 F.3d 696, 700 (6th Cir. 2012). Justice Sotomayor clarified in *Filarsky* that individual private parties must still "satisfy our usual test for conferring immunity" in a given case. 566 U.S. at 397 (Sotomayor, J., concurring). In extending qualified immunity to Baker Donelson, however, the majority has not carried out this required analysis as it relates to Baker Donelson and the circumstances of this case. And although the majority purports to confine its decision to the facts of this case, the majority creates confusion for future cases in broadly stating that "[w]hen private attorneys and law firms provide legal services to a government body," they are "eligible for qualified immunity in connection with that work." Majority Op. at 6.

Nor would the required analysis compel an extension of qualified immunity to Baker Donelson in this case, let alone all private attorneys and law firms representing the government, as the majority opinion indicates. Just because a court departed from our longstanding jurisprudence in extending qualified immunity to a specific attorney in *Filarsky* and a specific law firm in *Cullinan* does not mean that Baker Donelson is now entitled to the defense or that all private attorneys and law firms are. For example, in *Cooper v. Parrish*, we held that an attorney was not entitled to qualified immunity in a lawsuit involving the attorney's legal work with state prosecutors because "the circumstances . . . do not implicate the policy concerns that underlie the qualified immunity doctrine." 203 F.3d 937, 953 (6th Cir. 2000). We reasoned that the attorney "was not acting at the behest of the state when he participated in" the legal work with the government and "was not performing any unique government functions when he allegedly engaged in the unconstitutional conduct at issue in this case." *Id.* at 953. Similarly here, in firing Plaintiff solely because of its own business motivations as a for-profit private law firm, Baker Donelson did not perform any governmental objective, duty, or function for which the public interest would support extending qualified immunity. Allowing this wrongful termination lawsuit to proceed against Baker Donelson would not implicate any of the concerns that mandate qualified immunity for government officials, such as preserving their "ability to serve the public good," ensuring "that talented candidates were not deterred" from entering public service

because of the threat of a damages suit, and preventing "the distraction of officials from their governmental duties." *Wyatt*, 504 U.S. at 167. And shielding Baker Donelson from liability for a decision that the law firm made based on its own private business interests does not "act to safeguard the government" or "protect the public at large." *Id.* at 168.

The majority instead emphasizes that the following allegations in Delanis' complaint establish Baker Donelson's eligibility for qualified immunity: Baker Donelson served as counsel for the government, the government wished to punish DeLanis' speech, the government demanded and requested that the Baker Donelson fire DeLanis, and Baker Donelson fired DeLanis pursuant to these demands and requests from the government. *See* Majority Op. at 12 (citing Compl., R. 34, ¶ ¶ 114, 171). But merely following the government's demand or request does not justify the extension of qualified immunity to a law firm, even where the government is a client of the firm. Although DeLanis' allegations indicate that Baker Donelson "was motivated" by the government's request, Compl., R. 34, ¶ 114, Baker Donelson retained its own agency, separate from the government, in terminating DeLanis' employment; with regard to firing its own employee at the law firm, Baker Donelson made its own decision and did so solely for its own private business interests, as conceded by Baker Donelson at oral argument. In this case featuring a law firm's private business decision to fire its own employee, Baker Donelson is not eligible for qualified immunity.

In concluding that Baker Donelson may assert qualified immunity, the majority contends that Baker Donelson was performing a public function in firing Plaintiff, Majority Op. at 7, but in concluding that Baker Donelson did not violate a clearly established right, the majority emphasizes that Baker Donelson's business interests drove its conduct and Baker Donelson sought merely to maintain and increase the client revenue that it generated at all times relevant to these claims, *id.* at 16–17. Both cannot be true. Rather, Baker Donelson's focus on its own business interests illustrates that the firm did not carry out a public function during the relevant times of this case. In protecting its client base, allowing its business interests to drive its conduct, and seeking to maintain and increase the client revenue it generated—all facts recognized by the majority—Baker Donelson cannot be said to have worked "in the pursuit of government objectives" or be "principally concerned with enhancing the public good."

*See Filarsky*, 566 U.S. at 392.  In the events at issue in this case, Baker Donelson neither functioned in a public capacity nor demonstrated any concern regarding the public interest that would warrant extending qualified immunity to the law firm.

For these reasons, I would affirm the district court's denial of qualified immunity to Baker Donelson.  Although there may be a circumstance where a private actor is entitled to qualified immunity, this case is not one.  Accordingly, I respectfully dissent.